IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MAXTENA, INC. | : |
|  | : |
| v. | : Civil Action No. DKC 11-0945 |
|  | : |
| JEREMY MARKS | : |
|  | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution are three motions filed by Defendant Jeremy Marks: (1) a motion to dismiss the amended complaint for lack of personal jurisdiction and for improper venue (ECF No. 7), (2) a motion for leave to amend Defendant's first motion to dismiss (ECF No. 12), and (3) a motion to strike portions of the Declaration of Nathan Cummings and a portion of Plaintiff Maxtena's opposition to Marks's motion to dismiss the amended complaint (ECF No. 16); and one motion filed by Plaintiff Maxtena for leave to amend the Declaration of Nathan Cummings (ECF No. 21). The issues are fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motions will be denied and Plaintiff's motion will be granted.

I.   **Background**

   A.   **Factual Background**

   The following facts are either uncontroverted or taken in the light most favorable to Plaintiff Maxtena.   In May 2007, Defendant Marks, a resident of Georgia, founded Maxtena with Dr. Stanislav Licul and a third person in Blacksburg, Virginia, for the purpose of designing specialized antenna systems for various technology applications.   (ECF No. 20-1, Cummings Am. Decl., ¶ 3).   They agreed that Licul would serve as Maxtena's Chief Executive Officer, with Marks serving as both a corporate officer and director.   (*Id.* ¶ 4; ECF No. 15-1, Marks Supplemental Decl., ¶ 6).   Marks entered into a shareholder's agreement and a subscription agreement with Maxtena at this time, whereby he purchased one-third of Maxtena's shares of stock.   (ECF No. 20-1 ¶ 4; ECF No. 7-6; ECF No. 7-7).[1]   From the early stages of Maxtena's corporate life, Marks – along with Dr. Licul and Nathan Cummings, Maxtena's Maryland-based Vice President of Engineering – deemed it critical for the company to maintain a Maryland presence because the majority of Maxtena's clients and vendors were located in Maryland.   (ECF No. 20-1 ¶

---

   [1] The shareholder's agreement is governed by Virginia law. (ECF No. 7-7, at 13).   One of its provisions provides that Maxtena may repurchase all of an employee's shares for $100 if the employee is terminated for cause.   (*Id.* at 7).   The agreement defines "cause" to include acts of dishonesty, theft, or embezzlement.   (*Id.*).

7).  For this reason, shortly after its inception in 2007, Maxtena began operating an office in the basement of a home in Damascus, Maryland, and Marks visited this office on more than one occasion for antenna experiments. (*Id.* ¶ 6).

In February 2008, Maxtena moved its "base of operations" to Blacksburg, Virginia. (*Id.*). Despite this move, the company continued to derive its principal workload from Maryland clients; indeed, the initial project that Maxtena performed for a defense contractor based in Germantown, Maryland, (the "Germantown client"), became the company's primary business focus during its first two years of operations. (*Id.* ¶¶ 5, 7). Marks, Licul, and Cummings were each "directly involved" in all aspects of the work performed for the Germantown client during this time. (*Id.* ¶ 5). As Maxtena's Maryland-based business continued to increase, Maxtena's management team, including Marks, decided that the company needed to expand its physical presence in Maryland beyond the Damascus office. (*Id.* ¶ 10). Therefore, around March 2009, Maxtena leased office space in Bethesda, Maryland, and Marks used this office on numerous occasions to meet with Maxtena employees, contractors, and clients. (*Id.*).[2]

---

[2] Marks entered into a "Proprietary Information, Invention, and Non-Disclosure Agreement" ("PIA") with Maxtena, effective March 30, 2009, and this agreement provided that Marks would

The initial project for the Germantown client also continued to expand, with the client ultimately requesting that Maxtena work on three different proprietary products involving "phased array" technology. (*Id.* ¶¶ 3, 13).[3] Marks repeatedly visited the Germantown client regarding this work and exchanged emails and phone calls regularly with Maxtena employees in Maryland about these products. (*Id.* ¶ 13). Through this work, Marks "gained critical knowledge" about the phased array technology that Maxtena was using to develop these products for the Germantown client. (*Id.* ¶ 25).

Following its work on the "basic architecture" for the three phased array products, Maxtena began working on a marine-based antenna terminal for the Germantown client during the summer of 2009. (*Id.* ¶ 14). In essence, the marine-based antenna terminal was "an application" of Maxtena's prior work with the phased array products. (*Id.*). On November 11, 2009, "more substantial work and planning" related to this project

neither disclose nor use proprietary information that he learned during his employment with Maxtena except in connection with that employment. (ECF No. 7-17). This agreement is governed by Delaware law. (*Id.* ¶ 12).

[3] "Phased array" technology involves antenna systems consisting of "an array of multiple antenna elements working in concert." (ECF No. 7-4, Marks Compl., ¶ 16). "By selectively shifting the phase of individual elements of the array – to create a desired pattern of constructive and destructive radio interference – the antenna system can be electrically 'steered' even though it is physically stationary." (*Id.*).

began, with Marks attending a meeting in Maryland about the marine-based antenna terminal. (*Id.* ¶ 15). Marks participated in a teleconference with Cummings – who was located in Maryland – and Licul on or around December 28, 2009, to address coordination of the work on the project and to discuss its importance to Maxtena. (*Id.*). During this teleconference, Marks was selected as the project's principal architect and lead engineer. (*Id.*).[4]

From late 2009 until May or June of 2010, Marks attended weekly meetings about the marine-based antenna terminal: these meetings either took place at the Germantown client's site or through teleconferences that included employees of the Germantown client and/or Maxtena's Maryland-based employees. (*Id.* ¶ 17). In addition to these weekly meetings, Marks participated in contract negotiations and sales presentations related to the project and spoke with Maryland-based Maxtena

---

[4] Due in part to the fact that the marine-based terminal antenna became such an important project to Maxtena, on January 24, 2010, Maxtena's board of directors – including Marks – voted to move the company's headquarters "back to the Washington, D.C. area." (*Id.* ¶ 18). Maxtena subsequently changed its state of incorporation from Virginia to Delaware and, in August 2010, Maxtena moved its headquarters from Blacksburg, Virginia to a new office in Bethesda, Maryland. (*Id.* ¶¶ 11, 18; ECF No. 7-5, Marks Decl., ¶ 16).

employees about it in person, by phone, or by email "hundreds of times." (*Id.* ¶¶ 17, 20).[5]

On January 20, 2010, Marks emailed a "virtual blueprint" of the marine-based antenna terminal to Dale Douglas, a third party with whom Marks had recently formed a start-up company named Elevation SemiConductor. (*Id.* ¶ 26).[6]  The blueprint described the "inner workings of a circuit" for the marine-based antenna terminal and was marked "MAXTENA CONFIDENTIAL," and Marks would "never have been privy" to this information but for his work on the marine-based antenna terminal for the Germantown client. (*Id.* ¶¶ 27-28).  In the spring of 2010, other Maxtena employees noticed that Marks began missing work for extended periods of time – "weeks in some cases" – even though all Maxtena employees had been informed of the urgency of this project and the importance of adhering to its established deadlines.  (*Id.* ¶¶

---

[5] Marks's work on another project for the Germantown client also required him to attend weekly meetings with that client and/or Maxtena's Maryland-based employees, either in person or via conference call, from approximately April 2008 until June 2010. (*Id.* ¶ 21).

[6] Cummings's declaration lists January 20, 2011, as the date that Marks sent this email, but the reference to 2011 is in error.  The correct date is January 20, 2010, the date listed on the email that Maxtena attached to its amended complaint.  (ECF No. 5-1).

16, 29).[7]   Despite his repeated absences, Marks subsequently approved three prototypes of the marine-based antenna terminal, which Maxtena then shipped to the Germantown client for testing. (*Id.* ¶ 30).   The Germantown client, however, found the prototypes unacceptable and declined to place an order for an additional 100 units.   (*Id.* ¶ 34).   Maxtena lost approximately $340,000 in revenues as a result of the Germantown client's decision not to place this order.   (*Id.* ¶ 35).

Shortly thereafter, Maxtena learned about Marks's incorporation of Elevation SemiConductor and his email to Douglas containing confidential information about the marine-based antenna terminal.   (*Id.* ¶ 31).   Around July 7, 2010, Licul and Cummings confronted Marks about these activities and his repeated absences from Maxtena, and Marks was placed on a leave of absence.   (*Id.* ¶ 33).   Marks refused to return his company computer at that time, and when he did return it several weeks later, he had wiped the hard drive clean of work-related files. (*Id.*).   On July 26, 2010, Maxtena informed Marks that it was seeking to repurchase his shares - then valued at roughly $6 million - for $100, pursuant to the provision of the shareholder's agreement related to termination for cause.   (ECF No. 7-15, at 1; ECF No. 7-5 ¶ 39).   The same day, Maxtena sent

---

[7] Maxtena contends that Marks used these absences to perform work for Elevation SemiConductor.   (*Id.* ¶ 31).

Marks a letter reminding him of his duties under the PIA to keep the company's proprietary information confidential. (ECF No. 7-16). Marks refused to permit Maxtena to repurchase his shares for $100. (ECF No. 5 ¶ 50).

### B.   Procedural Background

On April 13, 2011, Maxtena filed a complaint against Marks in the United States District Court for the District of Maryland alleging the following five counts: (1) declaratory judgment that Maxtena is the rightful owner of Marks's shares, (2) breach of fiduciary duty, (3) violation of the Virginia Trade Secrets Act, (4) violation of the Virginia Business Conspiracy Act, and (5) breach of the PIA. (ECF No. 1). Marks moved to dismiss for lack of personal jurisdiction on June 20, 2011 (ECF No. 4), and Maxtena filed an amended complaint on July 8, 2011 (ECF No. 5).[8] The amended complaint included the five counts from the original complaint, as well as a count alleging violation of the Maryland Trade Secrets Act. (*Id.*).

On July 22, 2011, Marks filed a motion to dismiss the amended complaint, now alleging lack of personal jurisdiction

---

[8] After the filing of Maxtena's amended complaint, the parties agreed that Marks's original motion to dismiss was moot. (ECF Nos. 6, 8).

and improper venue. (ECF No. 7).[9] Shortly thereafter, Marks
also submitted a motion for leave to amend his first motion to
dismiss in order to add the defense of improper venue (ECF No.
12). Maxtena opposed both of these motions and submitted a
declaration from Cummings in support of its opposition to
Marks's motion to dismiss the amended complaint. (ECF Nos. 9,
13). On September 1, 2011, Marks moved to strike portions of
Cummings's declaration and a portion of Maxtena's opposition to
Marks's motion to dismiss the amended complaint. (ECF No. 16).
Maxtena opposed this motion and submitted a motion for leave to
amend Cumming's declaration on September 19, 2011. (ECF Nos.
20-21). Marks subsequently filed an opposition to Maxtena's
motion for leave to amend. (ECF No. 28).

---

[9] Marks filed a complaint against Maxtena in the United
States District Court for the Northern District of Georgia on
June 17, 2011. (ECF No. 7-4). That complaint alleges two
breach of contract claims and seeks declaratory judgments that
Marks continues to own the Maxtena shares he purchased in 2007
and that he did not violate the PIA by working for Elevation
SemiConductor. (*Id.*). Marks also seeks a declaratory judgment
regarding the fair value of his Maxtena shares. (*Id.*). Those
proceedings have been stayed pending the resolution of the
pending motions. (ECF No. 14, at 24 n.13).

## II.   Marks's Motion to Strike and Maxtena's Motion for Leave to Amend Cummings's Declaration

In his motion to strike, Marks seeks to strike the following:  (1) sixty statements within Cummings's thirty-five paragraph declaration for numerous reasons, and (2) three sentences in Maxtena's opposition to Marks's motion to dismiss the amended complaint because Maxtena failed to provide evidence supporting those statements.   Cummings's declaration is the primary evidence submitted by Maxtena in support of its opposition to Marks's motion to dismiss the amended complaint.   Thus, to determine what information may be considered in resolving Marks's remaining motions, this motion to strike must first be addressed.

Marks contends that a motion to strike is "a proper method" to challenge Cummings's declaration and Maxtena's opposition to Marks's motion to dismiss the amended complaint (ECF No. 16, at 3), but he does not cite any procedural rule as a basis for doing so.   Federal Rule of Civil Procedure 12(f) is the only procedural rule addressing motions to strike, and it states that a court may, on its own or on motion made by a party, "strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   Fed.R.Civ.P. 12(f) (emphasis added); *see also McNair v. Monsanto Co.*, 279 F.Supp.2d 1290, 1298 (M.D.Ga. 2003) ("[A] motion to strike is

only appropriately addressed toward matters contained in the pleadings."). Per Rule 7(a), pleadings include only the complaint, the answer to a complaint, counterclaim, or crossclaim, and – if permitted by the court – the reply to an answer). Thus, "'[m]otions, briefs or memoranda, objections, or affidavits may not be attacked by the motion to strike.'" *Lowery v. Hoffman*, 188 F.R.D. 651, 653 (M.D.Ala. 1999) (citing 2 James Moore *et al.*, *Moore's Federal Practice* § 12.37[2] (3$^d$ ed. 1999)).[10] Here, Marks seeks to strike portions of both a memorandum and a declaration filed by Maxtena, neither of which constitutes a pleading under Rule 7(a). Marks's motion to strike these items is, therefore, procedurally improper and will be denied.

When addressing such procedurally improper motions to strike, however, courts have long recognized that inadmissible evidence identified by the moving party should be disregarded, although not stricken, when resolving other pending motions. *E.g.*, *Lombard v. MCI Telecomms. Corp.*, 13 F.Supp.2d 621, 625

---

[10] The proper way for a party to register its objection to an opposing party's motions, memoranda, or affidavits is through the briefs or memoranda that the party submits to the court. *McNair*, 279 F.Supp.2d at 1298. "The court will then implicitly, if not explicitly, rule upon [the] objections in its consideration of the motion." *Id.*

(N.D.Ohio 1998); *McNair*, 279 F.Supp.2d at 1298.[11]  Although Marks raises a series of objections to more than sixty statements contained within Cummings's declaration, his primary objection relates to Cummings's failure to demonstrate that he had personal knowledge about the matters contained therein.  In response to this objection, Maxtena has moved for leave to amend Cummings's declaration to include detailed explanations about Cummings's knowledge of Marks's contacts with Maryland during the course of his employment with Maxtena.[12]  Maxtena's motion – which essentially involves submission of a revised declaration – will be granted and that revised declaration will be considered in evaluating Marks's objection as to Cummings's lack of personal knowledge.  *See Capitol Radiology v. Sandy Spring Bank*, No. 09-1262, 2010 WL 610785, at *4 (D.Md. Feb. 17, 2010) (permitting a plaintiff to cure several deficiencies in an affidavit, including failure to demonstrate personal knowledge, through submission of a revised affidavit).

The Federal Rules of Civil Procedure do not contain prerequisites for documents, such as declarations, appended to

_____

[11] Though framed in the form of a motion to strike, Marks's motion does request that the court "strike or disregard" those portions of Cummings's declaration that violate the Federal Rules of Evidence.  (ECF No. 16-1, at 2).

[12] The amended declaration also includes evidence to support the previously unsupported statements within Maxtena's opposition to Marks's motion to dismiss the amended complaint.

memoranda submitted in support of or in opposition to motions to
dismiss.  *McLaughlin v. Copeland*, 435 F.Supp. 513, 521 n.1
(D.Md. 1977).  Courts have routinely, however, looked to Rule 56
in judging declarations submitted in relation to Rule 12(b)
motions, concluding that such declarations must demonstrate the
declarant's personal knowledge in order to be admissible.  *Id.*
at 520 & 521 n.1.  Indeed, the party seeking to introduce the
declaration must make "an affirmative showing" that the
information contained in the declaration is within the
declarant's personal knowledge, *id.* at 520, and this showing may
require more than the "traditional litany of [a declarant's]
personal knowledge and competence to testify," *Goode v. STS Loan
& Mgmt., Inc.*, No. 2004-0999, 2005 WL 106492, at *2-3 (D.Md.
Jan. 14, 2005) (internal quotation marks and citation omitted).

Cummings makes such a showing in his revised declaration.
Not only does the opening paragraph of his declaration assert
that the facts contained therein are based on "personal, first-
hand knowledge" (ECF No. 20-1 ¶ 1), but the declaration also
explains, in detail, how exactly Cummings gained the knowledge
that he asserts, *i.e.*, through his role as Maxtena's Vice
President of Engineering and numerous personal interactions with
Marks.  Thus, Cummings's revised declaration sufficiently
demonstrates his personal knowledge of the events described in

the declaration, and it may be relied upon in resolving Marks's motion to dismiss the amended complaint.[13]

## III. Marks's Motions to Dismiss the Amended Complaint and to Amend the First Motion to Dismiss

Marks has moved to dismiss the amended complaint for lack of personal jurisdiction and for improper venue. These arguments will be addressed in turn.

### A.   Personal Jurisdiction

When a court's power to exercise personal jurisdiction over a nonresident defendant is challenged by a motion under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). If jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Combs v. Bakker*, 886

---

[13] Marks does raise several other objections to information that Cummings presents in the declaration, requesting that the court evaluate these objections on a sentence-by-sentence basis. These challenges will be considered, if necessary, when ruling on the merits of Marks's pending motion to dismiss the amended complaint. Evaluating such objections on a sentence-by-sentence basis here, however, would be neither efficient nor effective at streamlining the issues currently presented in this case.

F.2d 673, 676 (4th Cir. 1989).   If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits, and discovery materials, "the plaintiff need only make a *prima facie* showing of personal jurisdiction." *Carefirst*, 334 F.3d at 396.   In determining whether the plaintiff has proven a *prima facie* case of personal jurisdiction, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (internal quotation marks omitted).

## 1.    The Maryland Long-Arm Statute

A federal district court may exercise specific personal jurisdiction over a nonresident defendant if "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993).[14]   The Maryland Long-Arm Statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, authorizes the exercise of personal

---

[14]   Specific personal jurisdiction applies where a controversy is "related to or 'arises out of' a defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4ᵗʰ Cir. 2002) (citing *Androutsos v. Fairfax Hosp.*, 323 Md. 634, 637 (1991)). This broad reach does not suggest that analysis under the long-arm statute is irrelevant; rather, it reflects that, "to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to the outermost boundaries of the due process clause." *Dring v. Sullivan*, 423 F.Supp.2d 540, 545 (D.Md. 2006) (quoting *Joseph M. Coleman & Assocs., Ltd. v. Colonial Metals*, 887 F.Supp. 116, 118-19 n.2 (D.Md. 1995)).

Maxtena asserts that the court may exercise personal jurisdiction over Marks pursuant to sections (b)(1), (b)(2), and (b)(4) of the Maryland Long-Arm Statute.[15]   Those sections provide as follows:

> (b)   A court may exercise personal jurisdiction over a person, who directly or by agent:
>
> (1) Transacts any business or performs any character of work or service in the State;

---

[15] In its amended complaint, Maxtena asserts that section (b)(3) may also serve as the basis for personal jurisdiction, but it abandons this argument in its opposition to Marks's motion to dismiss the amended complaint. (ECF No. 9, at 20 n.7).

> (2) Contracts to supply . . . services . . .
> in the State; . . . [or]
>
> (4) Causes tortious injury in the State or
> outside of the State by an act or omission
> outside the State if he regularly does or
> solicits business, engages in any other
> persistent course of conduct in the State or
> derives substantial revenue from goods,
> food, services, or manufactured products
> used or consumed in the State[.]

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1)-(4).   The

Maryland Long-Arm Statute limits jurisdiction to cases in which

the cause of action "aris[es] from any act enumerated" in the

statute itself.   *Id.* § 6-103(a); *see also Johansson Corp. v.*

*Bowness Constr. Co.*, 304 F.Supp.2d 701, 704 (D.Md. 2004).[16]

Transacting business pursuant to section (b)(1) of the

long-arm statute "requires 'actions [that] culminate in

purposeful activity within the State.'" *Bahn v. Chi. Motor Club*

*Ins. Co.*, 98 Md.App. 559, 568 (1993); *Sleph v. Radtke*, 76

Md.App. 418, 427 (1988), *cert. denied*, 314 Md. 193 (1988).

Section (b)(1), however, does not require the defendant to have

been physically present in Maryland in order to have "transacted

business" within the meaning of the statute.   *Sleph*, 76 Md.App.

at 427 (internal quotation marks omitted).

---

[16] As will be seen, Maxtena can make a *prima facie* showing
of personal jurisdiction under section (b)(1); therefore, there
is no need to reach the parties' arguments as to sections (b)(2)
and (b)(4).

Before determining whether Marks's contacts satisfy section (b)(1), it is necessary to determine the appropriate facts to consider when evaluating whether Maxtena has made a *prima facie* case for personal jurisdiction over Marks.  In its opposition to Marks's motion to dismiss the amended complaint, Maxtena emphasizes both the contacts that Marks individually made with Maryland while working for Maxtena as well as the corporation's own contacts with Maryland.  Marks, on the other hand, argues that Maxtena's separate contacts with Maryland are not attributable to him and seeks to disavow the Maryland contacts that he created during his employment with Maxtena pursuant to the fiduciary shield doctrine.  These arguments both miss the mark, painting a picture of Marks's Maryland contacts that is either too broad or too narrow.

Despite Maxtena's implicit argument to the contrary, "[e]mployment [alone] is insufficient to give rise to personal jurisdiction, and a corporation's contacts with a forum state cannot be attributed to its employees." *Glynn v. EDO Corp.*, 536 F.Supp.2d 595, 604 (D.Md. 2008).  Rather, personal jurisdiction over a corporate employee must arise from the employee's *individual* contacts with the forum.  *See id.* at 604-05 (declining to exercise jurisdiction over two corporate officers whose individual contacts with Maryland were "limited" and "unrelated to the events underlying [the] litigation").

18

Maxtena's own contacts with Maryland – divorced entirely from Marks – thus cannot be imputed to Marks when determining whether the court may exercise personal jurisdiction over him.

In contrast to Maxtena's overly broad view, Marks seeks to define his relationship with Maryland in the narrowest sense possible, invoking the fiduciary shield doctrine to avoid being haled into this court on the basis of any Maryland contacts that he created while employed by Maxtena. "The fiduciary shield doctrine protects an individual, who acts in the forum state solely as the representative of the corporation, from suit in that state because he does not personally avail himself of the laws and protection of the forum state in any meaningful way." *United States v. Undetermined Quantities of Articles of Drug*, 145 F.Supp.2d 692, 706 (D.Md. 2001) (internal quotation marks omitted). Although Maryland courts do recognize this "rarely used" doctrine, *Compass Mktg., Inc. v. Schering-Plough Corp.*, 438 F.Supp.2d 592, 596-97 (D.Md. 2006), there are three common circumstances in which they decline to invoke it:  (1) the individual is the alter ego of the corporation, (2) the individual has a substantial interest in the corporation, and (3) the basis for personal jurisdiction over the individual arises under section (b)(1) of the Maryland Long-Arm statute. *Id.* (quoting *Zeman v. Lotus Heart, Inc.*, 717 F.Supp. 373, 376-77 (D.Md. 1989)).

Two of these circumstances are present here, counseling
against invocation of the fiduciary shield doctrine when
determining whether Marks is subject to personal jurisdiction in
Maryland. First, as an officer, director, and one-third owner
of Maxtena, Marks has a substantial interest in the company.
*See Zeman*, 717 F.Supp. at 377 (holding that a corporation's
president and vice president, owning 42.5% and 21.25% of the
corporation, respectively, could not invoke the fiduciary shield
doctrine to avoid being haled into court in Maryland); *see also
Undetermined Quantities of Articles of Drug*, 145 F.Supp.2d at
706 (finding that a corporate officer and shareholder had a
"substantial interest" in the corporation sufficient to preclude
application of the fiduciary shield doctrine). Indeed, "[i]t
would violate a sense of fairness to permit [Marks] to . . .
consummate corporate business in Maryland [where he] personally
had so direct and substantial an interest and then allow [him]
to avoid responding in Maryland to legal charges addressed to
[him] personally, which ar[o]se from those transactions."
*Zeman*, 717 F.Supp. at 377. Second, if the basis for personal
jurisdiction arises under section (b)(1) of the Maryland Long-
Arm Statute, the fiduciary shield doctrine does not apply
because "section (b)(1) . . . purports to authorize jurisdiction

to the peripheral limits of due process." *Undetermined Quantities of Articles of Drug*, 145 F.Supp.2d at 706.[17]   Thus, the individual contacts that Marks created with Maryland while employed by Maxtena are relevant to a determination of personal jurisdiction.

Looking to these individual contacts, Maxtena has shown that Marks "transacted business" in Maryland for purposes of section (b)(1).   Indeed, in an analogous case involving breach of contract and misappropriation of trade secrets, another judge in this district found contacts similar to Marks's sufficient to satisfy section (b)(1) of the long-arm statute.   *See Laureate Educ., Inc. v. Megahed*, No. AW-10-749, 2010 WL 2651895, at *8-9 (D.Md. July 1, 2010) (holding that a corporate executive had "transacted business" with her Maryland-based employer by attending business meetings in Baltimore on a monthly basis for

---

[17] Marks seeks to distinguish cases in which Maryland courts have declined to apply the fiduciary shield doctrine by noting that those cases involved disputes between corporate employees and third parties, rather than "a purely intra-corporate dispute." (ECF No. 14, at 14).   He does not, however, provide any support for drawing such a distinction.   Indeed, if anything, the fact that the dispute here is between a corporation and its employee may further weigh in favor of *declining* to apply the fiduciary shield doctrine. *Transplace Texas, LP v. Higgins*, No. 4:10-CV-428, 2011 WL 623172, at *4 n.2 (E.D.Tex. Jan. 19, 2011) (explicitly declining to apply the fiduciary shield doctrine where an employer sued its former employee for breach of contract and tortious interference with an existing contract and prospective business relations).

two years and engaging in weekly – "and often daily" - telephone and email communications with her Maryland-based colleagues). Marks maintains that *Laureate* is inapposite to resolution of the present case because the employer in *Laureate* was based in Maryland when the claims arose and because the contracts that the employee purportedly breached were executed by the employer in Maryland and governed by Maryland law.  These distinctions, however, do not indicate that Marks's contacts with Maryland fail to satisfy section (b)(1).  Indeed, the facts relied upon by the *Laureate* court in finding that the employee had "transacted business" within Maryland mirror those present here, as the *Laureate* court did not even mention the execution of the relevant contracts when finding section (b)(1) satisfied.  Here, Maxtena has demonstrated that Marks engaged in "purposeful [business] activity" in Maryland by attending weekly meetings with both the Germantown client and Maryland-based Maxtena employees to discuss the proprietary phased array technology and the marine-based antenna terminal.  In addition, the company submitted evidence that Marks engaged in telephone and email communications with Maryland-based Maxtena employees about these projects "hundreds of times."  (ECF No. 20-1 ¶ 17).

Marks also contends that, even if he did "transact business" in Maryland under section (b)(1), the Maryland Long-Arm Statute is not satisfied because "none of Maxtena's claims

Case 8:11-cv-00945-DKC   Document 32   Filed 01/12/12   Page 23 of 34


arise from acts, omissions, or transactions by Marks" in Maryland. (ECF No. 14, at 5). Once again, Marks draws his argument too narrowly. Maryland courts have long held that the long-arm statute confers jurisdiction as long as the claims asserted "bear some relationship to the acts in the forum state." *Malinow v. Eberly*, 322 F.Supp. 594, 599 (D.Md. 1971).[18] In fact, as long as "there is a showing of *some* purposeful acts performed by the defendant in Maryland in relation to . . . the cause[s] of action," courts may conclude that the causes of action arose from the acts enumerated in the long-arm statute. *Id.* (emphasis added); *see also Snyder*, 521 F.Supp. at 145-46.

Maxtena can make such a showing here. The company alleges that Marks's regular participation in meetings with the Germantown client and Maryland-based Maxtena employees, as well as his frequent communications with those employees about the phased array products and the marine-based antenna terminal, enabled him to gain access to the proprietary information that he purportedly misappropriated. Those contacts are relevant – and in some cases critical – to each of Maxtena's causes of actions against Marks. That is, the fact that Marks learned

---

[18] In *Malinow*, the court analyzed the precursor of section (a) of the Maryland Long-Arm Statute, but these sections have since been construed as "identical," thereby rendering the reasoning of *Malinow* instructive in interpreting the present section (a). *Snyder v. Hampton Indus., Inc.*, 521 F.Supp. 130, 145-46 (D.Md. 1981).

about and worked with the proprietary information repeatedly in Maryland "bear[s] some relationship" to the claims asserted against Marks because each of those claims arose due to his purported misappropriation and misuse of that very information for an unauthorized purpose. *Malinow*, 322 F.Supp. at 599.

Therefore, despite Marks's arguments to the contrary, Maxtena has demonstrated that Marks is subject to personal jurisdiction under section (b)(1) of the Maryland Long-Arm Statute.

### 2.   Due Process

The inquiry does not end with the long-arm statute, however, as the court must also consider whether the exercise of jurisdiction over Marks would violate the Due Process Clause of the Fourteenth Amendment.  In this step, the question is whether the defendant purposefully established "minimum contacts" with Maryland such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  Put differently, the court must consider whether Marks's contacts with Maryland are substantial enough that he "should reasonably anticipate being haled into court []here." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  The United States Court of Appeals for the Fourth Circuit has distilled these somewhat

abstract concepts into three basic prongs:  "(1) the extent to which the defendant 'purposefully avail[ed]' [him]self of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"  *ALS Scan*, 293 F.3d at 712.

As to the first prong, Maxtena has presented several facts supporting a finding that Marks purposefully availed himself of the privilege of conducting business in Maryland.  The Fourth Circuit has articulated a list of non-exclusive factors to consider when evaluating whether a defendant has engaged in purposeful availment of the forum state in the business context,[19] and several of these factors weigh in favor of such a

---

[19] Those factors are as follows:

> [W]hether the defendant maintains offices or agents in the forum state; whether the defendant owns property in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality and extent of the parties' communications about the business

finding here. According to Maxtena, Marks participated in the solicitation of business with the Germantown client by engaging in contract negotiations and sales presentations regarding the marine-based antenna terminal. As the lead engineer and principal architect on this project for nearly six months, a role that required frequent – often weekly - visits into the state, Marks also "deliberately engaged in significant . . . business activities" in Maryland. Additionally, the "nature, quality, and extent" of Marks's communications with the Germantown client and Maxtena's Maryland-based employees about the phased array products and the marine-based antenna terminal strongly suggest purposeful availment. Marks met weekly with the Germantown client and Maxtena's Maryland-based employees about these projects and communicated "hundreds of times" about these projects with the same individuals. (ECF No. 20-1 ¶ 17). In fact, Marks allegedly supported the business decision to relocate Maxtena to the Washington, D.C. area partly due to the importance of the marine-based antenna terminal project to Maxtena's business. Taken together, these facts support a finding that Marks purposefully availed himself of the

---

being transacted; whether the performance of
the contractual duties was to occur within
the forum.

*Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d
273, 278 (4th Cir. 2009) (citations omitted).

privileges of conducting business in Maryland through his employment at Maxtena. *See Laureate Educ., Inc.*, 2010 WL 2651895, at *6-7.

"The second prong of the test for specific jurisdiction – that the plaintiff's claims arise out of the activities directed at the forum – requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs*, 561 F.3d at 278-79. As previously explained in the context of the long-arm statute, this requirement is also arguably met in the present case. Marks learned about, worked with, and acquired the proprietary information that Maxtena alleges he misappropriated and misused through contacts that he created with the Germantown client and Maxtena's Maryland-based employees over a significant time period. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 318 (4th Cir. 2000) ("This case arises out of . . . [the defendant's] knowledge of company trade secrets that she allegedly acquired during her numerous visits to the company's headquarters in Maryland; and her abrupt departure from the company to work for a competitor, an action implicating the training and experience she acquired in Maryland when she regularly traveled [there] over a period of two years.").

An exercise of jurisdiction by this court would also be "constitutionally reasonable," satisfying the third prong of the test. *CFA Inst. v. Inst. of Chartered Fin. Analysts*, 551 F.3d

27

285, 296 (4th Cir. 2009).   "Generally, such an analysis ensures
that litigation is not so gravely difficult and inconvenient as
to place the defendant at a severe disadvantage in comparison to
his opponent."   *Id.* (internal quotation marks omitted).   Several
considerations are relevant here, including "(1) the burden on
the defendant of litigating in the forum; (2) the interest of
the forum state in adjudicating the dispute; (3) the plaintiff's
interest in obtaining convenient and effective relief; (4) the
shared interest of the states in obtaining efficient resolution
of disputes; and (5) the interests of the states in furthering
substantive social policies."   *Consulting Eng'rs*, 561 F.3d at
279.

On the whole, these considerations counsel in favor of
finding that Marks is subject to personal jurisdiction in
Maryland.   The burden of litigating in this forum is not such
that it would place Marks at a severe disadvantage in comparison
to Maxtena.   Marks emphasizes "the substantial burden of travel
and additional expense" that he will face by having to litigate
in Maryland (ECF No. 7-1, at 22), but he has obtained local
counsel and is prepared to go forward.   *Jones v. Koons Auto.,
Inc.*, 752 F.Supp.2d 670, 679 (D.Md. 2010).   Indeed, because
"progress in communications and transportation has made the
defense of a suit in a foreign tribunal less burdensome" in
recent years, *World-Wide Volkswagen Corp.*, 444 U.S. at 294,

28

requiring Marks to litigate this suit in Maryland would not be unreasonable. Maryland also has an interest in the resolution of the grievances of Maryland-based businesses, *Jones*, 752 F.Supp.2d at 679, even if those businesses are relatively new to the state. This conclusion is reinforced by the fact that portions of the transactions underlying Maxtena's claims took place in Maryland. In addition, Maxtena has a significant interest in litigating this dispute in the forum where it has long done substantial business and its headquarters is now located, particularly as many of the witnesses that it will likely seek to call are located in Maryland. (ECF No. 20-1 ¶ 36). No general "interests of the states" seem particularly relevant here, and Marks has not identified any in the memoranda that he has submitted to the court.[20]

---

[20] The reasoning of the *Ciena Corp.* and *Laureate* courts supports the conclusion that maintaining a suit against Marks in Maryland would not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316. As with *Laureate* in the context of the long-arm statute, the distinction that Marks seeks to draw between the present action and these cases for purposes of the due process analysis is ultimately unpersuasive. Although both *Ciena Corp.* and *Laureate* involved Maryland-based employers and employment agreements governed by Maryland law, most of the facts critical to those analyses – *e.g.*, regular visits to Maryland to acquire proprietary information – mirror those present in the instant case. Indeed, in some ways, Marks's contacts with Maryland may well have exceeded those of the defendants in *Ciena Corp.* and *Laureate*. Thus, while this factual scenario may involve a closer question regarding due process in some respects, considering the totality of Marks's Maryland contacts, it simply

At bottom, Marks's motion to dismiss for lack of personal jurisdiction misses the mark by focusing on the states in which his contacts with Maxtena predominate, rather than on whether he has sufficient contacts with Maryland such that the court's exercise of personal jurisdiction over him would not offend due process. *Prod. Grp. Int'l v. Goldman*, 337 F.Supp.2d 788, 798 (E.D.Va. 2004). Maxtena has set forth facts regarding contacts demonstrating that it would not offend due process to do so, thereby making a *prima facie* case for personal jurisdiction in Maryland. Accordingly, Marks's motion to dismiss for lack of personal jurisdiction will be denied.

### B. Improper Venue

In his motion to dismiss the amended complaint, Marks sets forth – for the first time – an argument that venue in Maryland is improper. Maxtena quickly points out that Marks waived this argument by failing to raise it in his first motion to dismiss. Marks responds by requesting leave to amend his first motion to dismiss to include the defense of improper venue.

Federal Rule of Civil Procedure 12(h)(1) describes improper venue as a waivable defense, with Rule 12(g)(2) providing that, except in circumstances not relevant here, "a party that makes a

---

cannot be said that Marks could not have reasonably anticipated being haled into a Maryland court to answer for the actions that he purportedly committed.

motion under [Rule 12] must not make another motion under [that] rule raising a defense or objection that was available to the party but omitted from its earlier motion." In the Fourth Circuit, courts have long applied this standard strictly and required the defendant to assert improper venue "at the time he makes his *first* defensive move." *Lanehart v. Devine*, 102 F.R.D. 592, 594 (D.Md. 1984) (emphasis added) (internal quotation marks omitted); *see also Patterson v. Whitlock*, 392 F.App'x 185, at *6-7 (4th Cir. 2010); *Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F.Supp.2d 527, 533 n.10 (D.Md. 2010). Indeed, when confronted with facts remarkably similar to those in the present case, the Fourth Circuit refused to permit a defendant to "revive" a waivable defense simply because the plaintiff amends its complaint. *See Rowley v. McMillan*, 502 F.2d 1326, 1332 -33 (4th Cir. 1974) (reaching this conclusion where the defendant sought to "revive" the defense of lack of personal jurisdiction by adding it to his motion to dismiss). The *Rowley* court reasoned as follows:

> [A]n amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading. An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended.

*Id.* at 1333; *see also Lanehart*, 102 F.R.D. at 594 (applying this reasoning where a defendant sought to "revive" a defense of improper venue).

Marks makes no argument – nor could he - that the improper venue defense was unavailable at the time he filed his original motion to dismiss.  Instead, in an attempt to avoid an outcome similar to *Rowley*, Marks cites an unpublished 2001 case from the United States District Court for the Northern District of California, in which the court permitted a defendant to include the defense of improper venue in a second motion to dismiss after the plaintiff chose to amend her original complaint.  *See generally Remley v. Lockheed Martin Corp.*, No. C00-2495CRB, 2001 WL 681257 (N.D.Cal. June 4, 2001).  *Remley*, even when coupled with the relatively few authorities that it references, is unconvincing in the face of the clear language set forth in Rule 12(g)(2).  The limited cases that have permitted defendants to amend their motions to dismiss to include previously omitted, waivable defenses generally do so because the defense was added prior to the time that the district court evaluated the motion or was "inadvertently omitted."  *Id.* at *3 (internal quotation marks omitted).  The plain language of Rule 12(g)(2), however, would appear to preclude such considerations.  *See, e.g.*, Fed.R.Civ.P. 12(g)(2) ("*Except as provided in Rule 12(h)(2) or (3)*, a party that makes a motion under this rule *must not* make

another motion . . . ." (emphasis added)).[21]  Permitting Marks to amend his first motion to dismiss to include the defense of improper venue would merely sanction an end run around both Rule 12(g)(2) and settled law within the Fourth Circuit.  Therefore, his motions to dismiss for improper venue and for leave to amend the first motion to dismiss will be denied.[22]

## IV.  Conclusion

For the foregoing reasons, Marks's motions to dismiss for lack of personal jurisdiction and for improper venue, to amend the first motion to dismiss, and to strike portions of the Declaration of Nathan Cummings and a portion of Maxtena's opposition to Marks's motion to dismiss the amended complaint will all be denied.  Maxtena's motion for leave to amend the

---

[21] Rule 12(h)(2)-(3) sets forth the circumstances in which a party may raise a defense of failure to state a claim, failure to join an indispensable party, or lack of subject matter jurisdiction.

[22] Even if Marks had raised the defense of improper venue within his first motion to dismiss, it may nonetheless have failed on the merits.  Maxtena alleges that venue is proper in Maryland under 28 U.S.C. § 1391 (a)(2) because "a substantial part of the events or omissions giving rise to the claim[s] occurred" here.  (ECF No. 9, at 32).  Numerous cases involving similar facts have held that venue in a particular district is proper where the employee who purportedly misappropriated confidential information accessed and learned about that information and performed his job responsibilities in the district where the employer later brought suit.  *See, e.g.*, *Ciena Corp.*, 203 F.3d at 318; *see also Prod. Grp. Int'l*, 337 F.Supp.2d at 798-99; *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F.Supp.2d 217, 236 (D.Mass. 2011).

Declaration of Nathan Cummings will be granted.   A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge