IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAXTENA, INC.                          :

                                       :

    v.                                 :   Civil Action No. DKC 11-0945

                                       :

JEREMY MARKS                           :

                                       :


**MEMORANDUM OPINION**

Presently pending and ready for review in this declaratory judgment and breach-of-contract action are several separate but related motions:  (1) the motion filed by Defendant Jeremy Marks to compel the production of documents by nonparty the State of Maryland Department of Business and Economic Development ("the State") (ECF No. 146); (2) Marks's motion for relief from the consent order entered on December 12, 2012 (ECF No. 153); and (3) the motion filed by Plaintiff Maxtena, Inc. ("Maxtena") seeking a protective order as to the same documents sought by Marks in his motion to compel (ECF No. 154).[1]  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  Because the documents at issue

---

[1] Also pending is Marks's motion to seal his motion to compel and related exhibits.  (ECF No. 147).  In light of the parties' stipulation that the motion to compel does not contain any confidential information (ECF No. 149), the motion to seal will be denied as moot, and the motion to compel will be ordered unsealed.

are privileged and there has been no waiver or forfeiture, Maxtena's motion for a protective order will be granted and Marks's motions will be denied.

## I.   Background

The following discussion of the facts presumes some familiarity with the numerous prior decisions in this case. (*E.g.*, ECF Nos. 32, 136).  On April 25, 2012, the court entered a consent order establishing a 90-day period for valuation discovery and deferring merits-based discovery pending completion of this initial discovery period and mediation.  (ECF No. 40).  During valuation discovery, Marks issued a number of subpoenas to non-parties, setting off a flurry of motions practice.  Relevant here, in late September and early October 2012, Marks issued several document and deposition subpoenas to various entities and employees of the State.[2]  Generally speaking, these subpoenas sought discovery regarding the business relationship between the State and Maxtena, including a

_____

[2] Marks issued the following three subpoenas: (1) a subpoena *duces tecum* to the State of Maryland Venture Fund (served on or about October 1, 2012, with a return date of October 5, 2012); (2) a deposition subpoena to Thomas Dann, the Managing Director of Equity Investments for the Maryland Venture Fund who negotiated the terms of the State's investment in Maxtena (served on or about October 2, 2012, with a deposition date of October 17, 2012); and (3) a subpoena *duces tecum* to Peter Greenleaf, chairman of the Maryland Venture Fund Authority (served on October 4, 2012, with a return date of October 5, 2012). (*See* ECF Nos. 73 & 78).

potential investment in Maxtena by the Maryland Venture Fund ("MVF"), a subunit of the State.[3]

The State moved to quash each of these three subpoenas on various grounds. (ECF Nos. 73 & 78). *Via* paperless orders issued on October 3 and October 4, 2012, the court stayed the State recipients' compliance with the terms of the subpoenas pending resolution of the State's motions to quash. (ECF Nos. 77 & 80). Shortly thereafter, Marks and the State began negotiating a resolution to their dispute. To that end, Marks filed two consent motions for extensions of time to respond to the State's motions to quash, indicating in both filings that the dispute could be resolved without the involvement of the court. (ECF Nos. 96 & 114).[4]

On December 11, 2012, Marks and the State filed a third consent motion requesting the entry of a proposed order to resolve the State's motions to quash. (ECF No. 138). The joint motion reported that Marks and the State "have agreed that the

---

[3] The State represents that the MVF, *via* Thomas Dann, began negotiating with Maxtena about a potential investment in July 2012 and that these negotiations "culminated in a transaction in which MVF made a substantial equity investment in the preferred stock issued by" Maxtena, which was completed on October 17, 2012. (ECF No. 151-1, at 4).

[4] In light of these consent motions, the court did not rule on the State's motions to quash in the memorandum opinion and order issued on December 11, 2012, which resolved many other discovery disputes in this action. (ECF Nos. 136 & 137).

[113 documents produced by the State on or about November 8, 2012] satisf[ied] the several [document] subpoenas" issued by Marks to the State. (*Id.* at 3). Marks and the State also agreed on the scope of the deposition of Thomas Dann, an employee of the State who oversaw negotiations with Maxtena regarding MVF's investment in the company. (*Id.*). The jointly proposed consent order memorialized these agreements as follows:

> 1. Pursuant to the agreement of the defendant Marks and the State as set out in the Motion, the Court finds that the State has fully complied with and satisfied the several subpoenas for production of documents served by Marks on the State, its agencies, units and employees.
>
> 2. The State's several Motions to Quash the subpoenas for production of documents directed to the State, its agencies and its employees are denied as moot but without prejudice.
>
> 3. Pursuant to the agreement of Marks and the State as set out in the Motion with respect to a fact deposition of Mr. Dann, Mr. Dann will appear for examination upon oral deposition at a mutually convenient place, time and date to be promptly agreed by Marks and the State, which deposition will satisfy the deposition subpoenas to the State, Mr. Dann and Mr. Greenleaf.

(ECF No. 138-1). After Maxtena confirmed that it had no objection (ECF No. 140), the court entered the proposed consent order on December 12 (ECF No. 141), seemingly putting an end to all disputes regarding the subpoenas issued to the State.

Yet that very same day, discord resurfaced. At his deposition on December 12, Mr. Dann revealed that he had withheld certain emails from the documents he provided to the State's litigation counsel for production to Marks on the basis of privilege. (ECF No. 146-9, Dann Depo. at 50). Some of these emails involved Maxtena's counsel and were dated after October 3, 2012, the date when Maxtena appointed Mr. Dann to its board of directors. (*Id.*). Mr. Dann's admission gave rise to a new round of contentious emails among counsel and, ultimately, the instant set of motions regarding whether Marks is entitled to production of the approximately 40 emails from Mr. Dann's inbox that involve Maxtena's litigation or corporate counsel.[5]

## II. Analysis

The respective positions of the parties and the State – as ascertained by their numerous and often duplicative briefs – can be summarized as follows. The State and Maxtena argue that production of the emails is not warranted because: (1) the December 12, 2012 consent order that was negotiated between the State and Marks precludes Marks from seeking additional

---

[5] At his deposition, Mr. Dann also revealed that he withheld certain emails involving counsel of record for the State (but not Maxtena) on the basis of attorney-client privilege. (ECF No. 146-9, Dann Depo. at 50). Marks does not seek any of these emails in connection with the instant motions, nor does he question the validity of the State's assertion of attorney-client privilege as to these internal emails.

documents from the State; (2) the emails are not responsive to Marks's subpoenas because they either are not relevant to valuation issues or were created after the subpoenas'' response dates; and (3) the emails are protected by Maxtena's attorney-client privilege or the common interest agreement between the State and Maxtena. (*See* ECF Nos. 150, 151-1, 154-1, 155, 156, 161).[6]  Marks, in turn, asserts that:  (1) the consent order should not control because the State never disclosed that it was withholding documents based on an assertion of privilege; (2) the emails are responsive; (3) the documents are not protected by either the attorney-client privilege or the common interest doctrine; and (4) Maxtena and the State have, in any event, forfeited any claims of privilege by not properly asserting them in response to the subpoenas. (*See* ECF Nos. 146-1, 152, 153, 157).

At this juncture, each of the three pending motions is arguably now moot.  Marks issued the State subpoenas as part of the initial period of valuation discovery, the primary goal of which was to allow the parties to prepare expert valuation reports and participate in mediation before Judge Schulze. Valuation discovery closed in early January 2013, and the

---

[6] Although the State and Maxtena submit separate briefs in support of and opposition to the motions at issue here, the substance of their arguments is, for the most part, identical.

parties exchanged expert reports shortly thereafter. Accordingly, disputes arising out of the subpoenas issued during this initial period of discovery could be deemed moot.

Nonetheless, because the parties' mediation was not successful and because merits-based discovery will begin shortly, it seems inevitable that certain aspects of the instant dispute will need to be resolved at some point in the future. Therefore, to obviate the need for yet another round of briefing, this memorandum opinion will address the critical questions of whether the emails in question are privileged and, if so, whether there has been any waiver or forfeiture.[7]

### A. Maxtena's Assertions of Privilege

Maxtena asserts that the 38 emails listed in its privilege log are protected by the attorney-client privilege, the common interest doctrine, or both, depending on who participated in the email chain. (*See* ECF No. 150-2). As Maxtena does in its opposition to Marks's motion to compel (ECF No. 150), these assertions will be addressed separately, first as those emails

---

[7] As noted, the parties and the State vigorously contest whether the consent order issued by the court on December 12, 2012, relieves the State of any further obligations in connection with the subpoenas issued by Marks. This dispute need not be reached in light of the conclusions below regarding privilege and waiver, and Marks's motion for relief from the consent order will be denied as moot. Likewise, the parties' arguments about whether the documents are responsive to subpoenas need not be reached.

where Mr. Dann is the only representative of the State involved (Email Nos. 1-8, 10-30) and then as to those emails where both Mr. Dann and outside corporate counsel for the State are involved (Email Nos. 9, 31-38).

### 1. The Emails Involving Mr. Dann Alone Are Protected By The Attorney-Client Privilege

As to the first set of emails (Email Nos. 1-8, 10-30), Maxtena advances two arguments.[8]  First, Maxtena contends that these emails are protected by its corporate attorney-client privilege by virtue of Mr. Dann's status as a director of the company.  (ECF No. 150, at 13-14).  In anticipation that Marks might "try to argue that attorney-client privilege could not apply . . . [because] Mr. Dann serves in dual roles" on behalf of Maxtena and the State, Maxtena alternatively asserts that nearly all of the emails involving Mr. Dann alone are also protected pursuant to a common interest agreement between Maxtena and the State.  (*Id*. at 14).[9]

The Maryland Court of Appeals has articulated the test for determining when the attorney-client privilege applies as follows:

---

[8] The references to specific email numbers used in this memorandum opinion correspond to the references used by Maxtena in its privilege log. (*See* ECF No. 150-2).

[9] For reasons that are not explained, Maxtena asserts only the attorney-client privilege as to Email Nos. 29 and 30. (*See* ECF No. 150-2, at 4-5).

> The privilege is understood to be a rule of
> evidence that prevents the disclosure of a
> confidential communication made by a client
> to his attorney for the purpose of obtaining
> legal advice.  In *Harrison v. State*, [276
> Md. 122 (1975)], we adopted Professor
> Wigmore's definition of the attorney-client
> privilege: (1) Where legal advice of [any]
> kind is sought (2) from a professional legal
> adviser in his capacity as such, (3) the
> communications relating to that purpose,
> (4) made in confidence (5) by the client,
> (6) are at his insistence permanently
> protected (7) from disclosure by himself or
> by his legal adviser, (8) except the
> protection [may] be waived.

*Newman v. State*, 384 Md. 285, 302 (2004) (internal quotation marks and citations omitted) (second and third alterations in original).[10]  The party asserting the privilege "bears the burden of establishing its existence and applicability."  *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 406 (1998).

Here, Maxtena contends that Email Nos. 1-8 and 10-30 are "obviously" protected by the attorney-client privilege because they are confidential communications between officers of Maxtena, including Mr. Dann, and Maxtena's litigation counsel (the firm of Cameron McEvoy PLLC) or Maxtena's corporate counsel

---

[10] Neither party specifically addresses what law applies to Maxtena's claim of attorney-client privilege.  Because jurisdiction in this case is premised on diversity of citizenship, the law of Maryland (*i.e.*, the law of the forum state) applies.  *See, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 285 n. 5 (4th Cir. 2000) (in diversity cases, "the availability of an evidentiary privilege is governed by the law of the forum state" (citing Fed.R.Evid. 501)).

(the firm of Cooley LLP) that concern legal advice regarding either Maxtena's strategy in this litigation or certain proposed business transactions, including those with the State. (ECF No. 150, at 11-12; ECF No. 161, at 6-7). In support of this position, Maxtena offers a sworn statement from Mr. Dann, who attests to the following: (1) he was appointed to Maxtena's board of directors on October 3, 2012; (2) one of his agreed upon roles as a Maxtena board member "was to help Maxtena manage any current or future litigation with Mr. Marks or any other third party"; (3) he maintains a password-protected email account for his official business, including his service on Maxtena's board, that is not accessible by anyone without his consent; and (4) he designated documents requested in the State subpoenas "as privileged on behalf of Maxtena" and asked the State's litigation counsel "to raise the privilege claims on Maxtena's behalf." (ECF No. 150-1, Dann. Decl. at 2-3). Maxtena also submits a privilege log indicating the particular subject of each email at issue (*e.g.*, "Marks litigation strategy"; "draft language related to Maxtena, Inc. Shareholder Agreement"; "Maryland Venture Fund investment closing"). (*See generally* ECF No. 150-2).

Marks responds by asserting that, because Maxtena and the State are "distinct entities, with separate identities, interests, and privileges[,] . . . any claim of privilege by

10

Maxtena as to documents within the possession, custody, or control of [the State], depends on proof that the Subject Documents were communications made pursuant to a 'common interest' or 'joint defense' agreement." (ECF No. 157, at 14). Thus, Marks apparently assumes – without explanation or citations to supporting case law – that communications contained within Mr. Dann's official State email account cannot be subject to a claim of attorney-client privilege held by Maxtena alone.

Marks's assumption is not supported in law or fact. To the extent that Marks is implying that Maxtena waived its privilege by disclosing the subject emails to Robert Stokes, the Assistant Attorney General who serves as litigation counsel for the State in connection with this action, that assumption is belied by the factual record. There is no evidence indicating that Mr. Stokes ever personally reviewed the documents Mr. Dann withheld. Indeed, many of Marks's arguments rely on accusations that Mr. Stokes improperly allowed Mr. Dann to unilaterally pick and choose what documents to produce. (*See, e.g.*, ECF No. 157, at 6 ("It seems as though all [the State's] counsel ever saw was a screen print of an email folder provided to him by Mr. Dann.")).

Likewise, to the extent that Marks is simply assuming that the State's ownership of Mr. Dann's email account necessarily precludes Mr. Dann from asserting a claim of attorney-client privilege on behalf of another entity, Marks again fails to

11

support this assumption. Courts in some jurisdictions have held that an employee's use of an employer's email system to communicate with her personal counsel may result in a waiver of confidentiality (and by extension, the attorney-client privilege) if the employee did not have a reasonable expectation of privacy as to the content of the communications. *See, e.g.*, *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 256-60 (Bankr. S.D.N.Y. 2005) (discussing whether corporate insiders waived attorney-client privilege as to unencrypted emails with their personal attorneys transmitted *via* the corporation's email system). The question of whether confidentiality has been waived in such circumstances typically turns on four factors: (1) whether the employer had a policy banning personal use; (2) whether the employer monitored employees' use of email; (3) whether third parties have a right of access to the computer and the email; and (4) whether the employee was aware of the use and monitoring policy. *Id.* at 257; *see also Hanson v. First Nat'l Bank*, Civ. No. 10-0906, 2011 WL 5201430, at *5-6 (S.D.W.Va. Oct. 31, 2011) (applying the *Asia Global* factors).[11]

---

[11] Although most of the cases applying the *Asia Global* factors involve the confidentiality of emails between an employee and her personal counsel, at least one court has used the same test in a case where the emails involve counsel for another corporate entity. *See In re High-Tech Employee Antitrust Litig.*, No. 11cv2509, 2013 WL 772668, at *6-8 (N.D.Cal. Feb. 28, 2013). In *High-Tech*, as here, the employee

There is no evidence here indicating that the State maintained any sort of monitoring or use policy. To the contrary, Mr. Dann avers that his State email account was password-protected and accessible only with his consent. (ECF No. 152-1, Dann Decl. ¶ 5). Based on the current record, there is no basis for concluding that Mr. Dann necessarily waived the confidentiality of his communications with Maxtena's counsel by using the State's email system.

Finally, Marks does not question the fundamental principle underlying Maxtena's claim of attorney-client privilege – namely, that its corporate privilege encompasses confidential communications involving Mr. Dann in his capacity as a member of the company's board of directors. The Maryland Court of Appeals has not yet delineated a precise test for determining the applicability of the attorney-client privilege "in the corporate context." *See E.I. du Pont*, 351 Md. at 418-21 (discussing the

---

held "dual role[s]" on behalf of two corporations: he was a full-time employee of Intuit, Inc., but also was the "functional equivalent" of an employee of Google, Inc.'s. *Id.* at *4-5. To determine whether Google had waived its corporate attorney-client privilege as to emails sent by its "functional employee" using his Intuit-owned email account, the court observed that the *Asia Global* factors are "useful" in answering the critical question of whether "[the functional employee] and Google ha[d] an objectively reasonable expectation of confidentiality in emails sent through Intuit's system." *Id.* at *6. Ultimately, the court found that the "lack of evidence that Intuit in fact monitored [the employee's] emails supports the preservation of privilege in this case." *Id.* at *7.

"control group" test, the "subject matter" test, and hybrids of the two tests without deciding which presents the soundest approach).  This uncertainty is irrelevant in the instant case because the communications involving Mr. Dann are protected even under the "control group" test, which is the narrowest of the approaches discussed in *E.I. du Pont*.  *See id.* at 418-19 (characterizing the control group test as "narrow in scope"). Under the control group test, a corporation's attorney-client privilege protects "communications directed to or from employees in the control group, which is comprised of those who play a substantial role in corporate decision-making."  *Id.*

As a director of Maxtena – a corporation organized under Delaware law – Mr. Dann clearly played a substantial role in corporate decision-making as of October 3, 2012, the date of his appointment.  *See, e.g.*, Del. Code tit. 8, § 141 ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors[.]").  Thus, communications between Mr. Dann and Maxtena's attorneys after this date are covered by Maxtena's corporate attorney-client privilege, provided that they relate to Mr. Dann's role as a Maxtena director and that the other elements of the attorney-client privilege test are met.  As noted, Maxtena submits Mr. Dann's affidavit and a privilege log indicating that each of the emails in this first group relates

14

to the provision of legal advice in connection with this litigation, the finalization of the State's investment in Maxtena, or other Maxtena legal issues.   Marks does nothing to rebut this evidence other than to make conclusory statements that documents in the State's possession cannot be subject to a claim of privilege by Maxtena.   (*See* ECF No. 152, at 10-12; ECF No. 157, at 14).   Accordingly, Maxtena has met its burden of establishing that Email Nos. 1-8 and 10-30 are protected by the attorney-client privilege, and its alternative argument regarding the applicability of the common interest doctrine need not be addressed as to this first group of emails.

> **2.   The Emails Involving Mr. Dann and Corporate Counsel for the State Are Protected Pursuant to a Valid Common Interest Agreement**

As to the second group of emails that involve Maxtena's counsel, Mr. Dann, and outside corporate counsel for the State (Email Nos. 9, 31-38), Maxtena asserts that the documents are protected pursuant to an oral agreement between Maxtena and the State to work cooperatively with respect to their shared concern that Marks might bring claims "concerning the company's expansion of its stock option pool and the closing of the [State's] investment in Maxtena." (ECF No. 151, at 14-15).

"[U]nder the common interest rule, parties with shared interests in actual or pending litigation against a common adversary may share privileged information without waiving their

right to assert the privilege." *Gallagher v. Office of Attorney Gen.*, 141 Md.App. 664, 676 (2001). The rule is "designed to facilitate the 'free flow of information from client to attorney' and to aid in the development of joint strategies." *Id.* at 677 (quoting *In re Grand Jury Subpoenas, 89-3 & 89-4, John Doe 89-129 (Under Seal)*, 902 F.2d 244, 248-49 (4th Cir. 1990)). Litigation need not be active; rather, "[s]o long as the transferor and transferee *anticipate* litigation against a common adversary on the same or similar issues, they have a strong common interest in sharing the fruit of the trial preparation efforts." *Id.* (internal quotation marks omitted) (emphasis added); *see also United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996) ("[I]t is unnecessary that there be actual litigation in progress for [the common interest doctrine] to apply.").[12] Although "[t]he common interest doctrine does not require a written agreement," there "must be an agreement or a meeting of the minds"; "[m]ere indicia of joint strategy as of a particular point in time are insufficient." *Am. Mgt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 733 (4th Cir. 2013) (internal quotation marks and citations omitted).

---

[12] In *Gallagher*, the Maryland Court of Special Appeals cited favorably to Fourth Circuit case law. *See Gallagher*, 141 Md.App. at 676-77. It therefore will be assumed that the Maryland Court of Appeals would likewise consider Fourth Circuit precedent in defining the parameters of the doctrine under Maryland law.

Here, in support of the existence of an oral common interest agreement, Maxtena and the State present the sworn statements of Mr. Dann and Timothy McEvoy, Maxtena's litigation counsel.   Mr. Dann and Mr. McEvoy both attest that they spoke at the October 3rd meeting of Maxtena's board of directors about future communications.   (ECF No. 150-1, Dann Decl. ¶ 2; ECF No. 150-2, McEvoy Decl. ¶ 2).   Both gentlemen represent that, at the time of their conversation, they understood that Mr. Dann's communications with Maxtena's counsel would be protected by the attorney-client privilege going forward because of his new role as a director of the company.   (ECF No. 150-1, Dann Decl. ¶ 4; ECF No. 150-3, McEvoy Decl. ¶ 4).   Nonetheless, Mr. Dann and Mr. McEvoy aver that they entered into a common interest agreement on behalf of the State and Maxtena as to "all communications related in any way to the subject matter of the Marks litigation, or Maxtena issues that might impact other actual or potential litigations."   (ECF No. 150-1, Dann Decl. ¶ 4; ECF No. 150-3, McEvoy Decl. ¶ 3).   The purpose of this agreement was twofold.   First, the gentlemen decided that such an agreement was prudent, "out of an abundance of caution," to provide an extra layer of protection to Mr. Dann's communications with Maxtena's counsel in case anyone disputed Maxtena's assertion of its corporate attorney-client privilege.   (ECF No. 150-1, Dann Decl. ¶¶ 4, 7; ECF No. 150-3, McEvoy Decl. ¶¶ 3-4).   Second, Mr.

17

Dann avers that because "there was reason to believe that Marks might try to take advantage of some perceived flaw in the way the [investment deal] was concluded, to the detriment" of both the State and Maxtena, the parties agreed to "work[] cooperatively with [both entities'] counsel with the expectation that the communications would remain privileged." (ECF No. 150-1, Dann Decl. ¶ 9).  According to Mr. Dann, the subject matter of Email Nos. 9 and 31-38 falls into this latter category. (*Id.*).

Marks responds with several arguments, none of which are availing based on the current record.  (ECF No. 152, at 10-12; ECF No. 157, at 15-21).  First, Marks contends that, at the time of the purported oral agreement, Maxtena and the State were still adverse parties involved in negotiations about the investment deal that did not conclude until October 17, 2012. Thus, according to Marks, any common interest shared by the entities by virtue of the State's contemplated investment was commercial, rather than legal, in nature.

Courts uniformly hold that, in order for the doctrine to apply, "the common interest must be legal in nature." *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 416 (D.Md. 2005) (citing *Aramony*, 88 F.3d at 1392).  Accordingly, the doctrine "'does not encompass a joint business strategy which happens to include as one of its

18

elements a concern about litigation.'" *Id.* (quoting *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995)). Illustrative is *Aramony*, where the former CEO of a nonprofit organization faced criminal charges for defrauding the organization. 88 F.3d at 1373. At issue there were certain communications between the CEO and the attorneys hired by the organization to provide legal advice about how to respond to the allegations of fraud. *Id.* at 1389-90. The CEO argued that the common interest doctrine protected the communications because he and the organization "pursued a common strategy with respect to the press inquiries [about his alleged fraud] and any potential litigation to which the press reports could give rise." *Id.* at 1392. The Fourth Circuit rejected this argument, observing that although the organization and the CEO may have shared an interest in defending against the allegations and preserving the organization's reputation, such interests simply were not "legal matter[s]" concerning the organization. *Id.* The *Aramony* court noted that if the allegations regarding the CEO "could have subjected [the organization] to civil or criminal liability, [the CEO's] claim would be stronger"; however, absent a showing of "how [the organization] would be affected (apart from the stain of its reputation) by the allegations," the doctrine did not apply. *Id.; see also Prowess, Inc. v. Raysearch Labs. AB*, CIV. WDQ-11-

1357, 2013 WL 509021, at *5-6 (D.Md. Feb. 11, 2013) (applying *Aramony* in a patent infringement suit to hold that the common interest doctrine did not apply to protect communications between the patent licensee – the plaintiff – and the patent assignee – a non-party – where there was no evidence showing how the assignee could be affected by the suit's outcome).

The instant case is distinguishable from *Aramony.* According to Mr. Dann, the State shared Maxtena's interest in executing the investment deal and associated stock option expansion plan in a way that would avoid an attack by Marks (and, if necessary, prevail against such an attack).  Although rooted in the entities' burgeoning commercial relationship, this shared interest is decidedly legal in nature as it relates to their shared concern about potential civil liability to Marks. Thus, unlike in *Aramony*, the State's concern – at least with respect to the subject matter of the second group of emails[13] – was not limited merely to preserving its reputation or even protecting its financial interests as a soon-to-be stockholder in Maxtena.

_____

[13] Because the subject matter of each of the emails in this second group relates to legal advice about the closing of MVF's investment in Maxtena or the related stock option expansion plan (*see* ECF No. 150-2), this memorandum opinion does not decide whether any interest shared by Maxtena and the State in connection with *this* litigation would be "legal" in nature.

Nor can it be said that the State's and Maxtena's shared concern about the possibility of facing new claims by Marks was unfounded.  Mr. Dann avers that, at the time he spoke with Mr. McEvoy on October 3, he believed that it was "reasonably likely that Mr. Marks could likely object to various aspects of the MVF/Maxtena deal, possibly resulting in more litigation (for example, the stock option plan)."  (ECF No. 151-1, Dann Decl. ¶ 6).  Mr. Dann states that he based his belief on the pleadings filed in this action.  (*Id.*).  Although Marks maintains that he "is not aware of having threatened any litigation against [the State] on or before October 3, 2012," (ECF No. 157, at 16 n. 10), a review of the publically available docket in this case as of October 3, 2012, could give rise to a reasonable belief that Marks might assert claims against any party involved in a transaction that affected the value of Maxtena or his purported ownership stake in the company.[14]  In particular, the reasonableness of such a belief is supported by Marks's

---

[14] The reasonableness of the State's concern makes this case distinguishable from *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 525 (D.Conn. 1976), a case relied on by Marks.  There, the court rejected the assertion of the common interest privilege by an entity that shared legal advice about its exposure to antitrust liability with a potential joint venturer during the entities' negotiations.  The court held that this advice was not entitled to protection under the common interest doctrine because the circumstances did not support a "reasonable expectation" that the advice "sufficiently concerned the risk of [the adversary's] shared exposure to [antitrust] liability."  *Id.*

counterclaim allegations that he is entitled to the "fair value"
of his shares (*see* ECF No. 34), as well as the sheer number of
motions that Marks's litigation tactics had generated by that
point in time.[15]

Finally, it is significant that all of the emails in the
second group involve both counsel for Maxtena and outside
counsel for the State – corroborating Mr. Dann's representations
that the State and Maxtena worked cooperatively regarding their
shared concern about future claims by Marks.  The participation
of both entities' attorneys distinguishes this case from *Bank
Brussels*, the principal decision relied on by Marks.  In *Bank
Brussels*, a bank shared an opinion letter authored by its
counsel with other members of a "bank group" who collectively
financed a corporation's purchase of crude oil.  *See* 160 F.R.D.
at 446-47.  The bank asserted that the dissemination of this
letter did not destroy its privileged status because each of the
members shared a common concern about "being drawn into

_____

[15] Indeed, as Maxtena observes in its reply (ECF No. 155, at
10-11), the entities' concerns have proven to be well-founded in
light of the recent lawsuit initiated by Marks (*Jeremy Marks v.
Thomas Dann, et al.*, Case No. 13-cv-347 DKC) alleging that Mr.
Dann, on behalf of the State, conspired with other Maxtena
directors to dilute the value of Marks's stock through the
State's investment in Maxtena and the associated stock option
plan.  Although the State itself is not named as a defendant,
Marks alleges that Mr. Dann's involvement in the State-Maxtena
deal was designed to benefit MVF "at Marks's expense."  (Case
No. 13-cv-347 DKC, ECF No. 1 ¶ 11).

litigation with" one of the corporation's shareholders – a concern that the memo addressed. *Id.* at 447. The court rejected this assertion because, despite the members' shared concern about shareholder litigation, "there [wa]s no evidence that they formulated a joint legal strategy to deal with the possibility." *Id.* at 448. In particular, there was no evidence indicating that the law firm that authored the memorandum ever "coordinated its legal efforts with attorneys for any other" member. *Id.* Here, by contrast, the involvement of both the State's and Maxtena's counsel in the second group of emails constitutes evidence of a coordinated legal strategy to minimize the possibility of future litigation with Marks arising out of the State's investment in Maxtena and the expansion of the company's stock option pool.

Marks's other arguments to defeat the applicability of the common interest doctrine require little discussion. Marks cites *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989), to contend that the common interest doctrine is not available because Mr. Stokes – who is counsel of record for the State in this litigation – had no knowledge of, or involvement in, the purported agreement. This argument is unavailing for two reasons. First, as Maxtena notes, the Fourth Circuit has never required an attorney's involvement as a prerequisite to a valid common interest

agreement. *See Baltimore Scrap Corp. v. David J. Joseph Co.*, No. L-96-827, 1996 WL 720785, at *7 n. 9 (D.Md. Nov. 20, 1996) (distinguishing *Bay State Ambulance*). Second, as discussed above, the State's corporate counsel was involved in this second group of emails, which supports the existence of a coordinated legal strategy between the two entities.

Finally, Marks's assertion that Mr. Dann lacked authority to bind the State to a common interest agreement is not persuasive. Even assuming – contrary to the weight of the evidence[16] – that Mr. Dann lacked authority to enter into a common interest agreement on behalf of the State, the State has undoubtedly ratified the agreement by affirming its existence in the briefs filed here. *See Volcjak v. Wash. Cnty. Hosp. Ass'n*, 124 Md.App. 481, 508 n. 13 (1999) ("[D]efense of litigation challenging a claimed unauthorized act constitutes ratification[.]" (citing Restatement (Second) of Agency § 97 (1958)); *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md.App. 431, 442 (1986) (holding that ratification may be inferred when the principal, through works, conduct, or silence, indicates its desire to affirm the unauthorized act).

---

[16] The evidence indicates that, at all times, Mr. Dann served as the State's primary representative in all dealings with Maxtena. The State later formalized Mr. Dann's authority in a "special delegation" dated November 27, 2012. (ECF No. 151-4).

24

**B.   Neither Maxtena Nor The State Have Forfeited Or Waived Privilege**

Having determined that the emails in question are privileged, the only remaining issue is whether there has been any forfeiture or waiver.  Marks argues at length that Maxtena waived any privilege that may have attached to the emails by not openly asserting it in response to the State subpoenas.  (ECF No. 152; at 8-10; ECF No. 157, at 8-14).  Marks points out that Maxtena remained silent throughout his negotiations with the State to resolve the subpoena disputes and never gave any indication that it might assert a claim of privilege as to documents in the State's care, custody, or control.  Although it certainly would have been preferable for Maxtena openly to have asserted its privilege claims at an earlier date, the procedural posture of this case does not warrant a finding of forfeiture.

As Marks observes, Fed.R.Civ.P. 45(c)(3) allows a party, upon "timely motion," to seek an order quashing or modifying to a third-party subpoena "that requires disclosure of privileged or other protected matter, if no exception or waiver applies." Relatedly, Rule 26(b)(5) provides that "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged . . . the party must:  (1) expressly make the claim; and (2) describe the nature of the documents, communications or tangible things . . . in a matter that . . .

will enable other parties to assess the claim." *See also* Local Rules, Guideline 10.

It is undisputed that Maxtena never filed a Rule 45(c) motion or otherwise argued that the subpoenas issued by Marks to the State sought disclosure of privileged documents. Additionally, neither Maxtena nor the State provided a privilege log describing the documents withheld by Mr. Dann until after the instant dispute arose. Although disappointing, neither of these omissions is sufficient – in light of the procedural posture – to result in any waiver or forfeiture. As noted, the State entities' compliance with the subpoenas was stayed pending resolution of its motions to quash. This stay necessarily extended the deadline for Maxtena to file its own Rule 45(c) motion until the court established a new compliance period. *See Sher v. SAF Fin., Inc.*, No. RDB 10-1895, 2011 WL 148446, at *2 (D.Md. Apr. 19, 2011) (explaining that, under Rule 45, the plaintiff "could have filed a timely motion to quash or modify [the third-party subpoena] any time before the compliance period ran out"). Before the court ruled on the merits of the State's motions or lifted the stay, the State and Marks jointly requested the entry of a consent order purporting to resolve all disputes relating to the subpoenas. It was not unreasonable for Maxtena to rely on the finality seemingly provided by the

consent order.   Thus, there is no basis for ordering production of the emails on the basis of waiver or forfeiture.

## III. Conclusion

For the reasons set forth above, Marks's motion to compel will be denied; Maxtena's motion for a protective order will be granted; and Marks's motion for relief from the December 12, 2012 consent order will be denied as moot.   A separate Order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge