IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAXTENA, INC.                       :

                                    :

        v.                          :   Civil Action No. DKC 11-0945

                                    :

JEREMY MARKS                        :

                                    :

**MEMORANDUM OPINION**

Once again, numerous motions are pending and ready for
review in this dispute.  The following motions will be addressed
in this Memorandum Opinion:  (1) the motion for partial judgment
on the pleadings filed by Defendant Jeremy Marks (ECF No. 192);
and (2) the motion filed by Defendant seeking to strike Answer
and Other Defenses of Maxtena, Inc. to Counterclaim (ECF No.
225).[1]  The issues have been fully briefed, and the court now
rules pursuant to Local Rule 105.6, no hearing being deemed
necessary.  For the reasons that follow, the motion for partial
judgment on the pleadings will be denied.  The motion to strike
Answer and Other Defenses of Maxtena, Inc. to Counterclaim will
be granted.

I.   **Background**

In light of the many Memorandum Opinions that have been
issued previously (*e.g.*, ECF Nos. 32, 136, 162), some

---

[1] Multiple motions concerning discovery have been referred
to United States Magistrate Judge Connelly for resolution.

familiarity with the tangled procedural history of this case will be presumed. Maxtena, Inc. ("Maxtena") filed suit against Marks on April 13, 2011. Following an unsuccessful motion to dismiss for lack of personal jurisdiction by Marks, the parties agreed to engage in an initial period of "financial and valuation" discovery, ostensibly "[i]n an effort to facilitate settlement discussions." (ECF No. 40, at 1). Ultimately, however, this initial period of valuation discovery accomplished little in the way of conciliation. If anything, the dozens of disputes that arose during valuation discovery served to heighten the animosity and mistrust between the parties and their counsel.

Following an unsuccessful mediation before Judge Schulze, the parties began merits-based discovery, which has led to a fresh round of disputes over both the proper scope of discovery and the legal *bona fides* of each party's claims. To resolve the current set of motions, a brief review of the allegations and claims asserted in the operative pleadings is warranted.

### A.   Maxtena's Second Amended Complaint

Maxtena alleges the following facts in its second amended complaint. (ECF No. 199). Maxtena is an antenna company specializing in "phased array technology" that was incorporated in 2007 under Virginia law. On May 18, 2007, Maxtena and its three founders entered into a "Shareholders Agreement." (ECF

2

No. 192-6).  As relevant to the pending motions, the Shareholders Agreement contains the following provisions. First, the Shareholders Agreement defines "Corporation" as "Maxtena, Inc., a Virginia corporation" and "Shareholders" as "Stanislav Licul, Warren Stutzman and Jeremy Marks." (*Id.* at 1).  The term "Shares" is defined as "all issued and outstanding shares of the Corporation's capital stock, including any such shares issued by the Corporation in the future pursuant to any subscription, option, conversion right, bonus plan or similar grant or arrangement, dividend, stock split, reverse stock split, merger, share exchange, recapitalization, reorganization, or other transaction." (*Id.* § 1(c)).

The Shareholders Agreement identifies three purposes for the document: (1) "to restrict the transfer of the Shares"; (2) "to permit certain Transfers . . . of the Shares in order to promote the orderly succession of the ownership and management of the Corporation"; and (3) "to ensure the continuity of the ownership and management of the Corporation." (*Id.*, Recitals § B).  To that end, the Shareholders Agreement includes a number of provisions regarding when and how Shareholders can sell, exchange, pledge, gift, bequeath, attach, or otherwise transfer Shares. (*See generally id.* §§ 2-6).  In Section 5, the Shareholders Agreement provides that if a Shareholder's "employment with the Corporation ceases for any reason

whatsoever, the Corporation shall have the right, but not the obligation, to purchase some portion or all of such Shareholder's Shares." Additionally, the contract states that "[i]n the event of a termination of a Shareholder's employment by the Corporation for Cause, the Purchase Price shall be equal to One Hundred Dollars ($100)." (*Id.* § 6(c)) ("the $100-Buyback Provision"). "Cause" is defined as "(i) an act or acts of dishonesty, theft or embezzlement on the Shareholder's part which are intended to or do result in either the Shareholder's personal enrichment or material adverse [e]ffect upon the Corporation's assets, business, prospects or reputation, or (ii) commission of a felony." (*Id.*).

Sections 13 and 14 of the Shareholders Agreement provide:

> 13. <u>Term</u>. The term of this Agreement shall be from the date hereof until the acquisition of substantially all the assets of the Corporation or all the outstanding Shares (whether by merger, share exchange or otherwise) resulting in the Shareholders receiving cash or cash equivalents or Shares listed on the NASDAQ National Market System, over-the-counter market or traded on a national exchange, provided that such acquisition is approved by a vote of the Shareholders pursuant to Section 7. A Shareholder who no longer holds any Shares shall not be entitled to any further rights, nor be subject to any further obligations, under the terms of this Agreement, provided that such Shareholder has not violated this Agreement in obtaining such status, and provided further that this Agreement shall remain in full force and effect as to all other Shareholders until it shall cease to

be in effect in accordance with this Section 11.

14. <u>Binding Effect; Entire Agreement; Counterparts</u>. This Agreement shall be binding and inure to the benefit of the parties hereto, their successors, heirs, distributes, legatees, personal representatives or assigns. This Agreement constitutes the entire agreement among the parties respecting the subject matter hereof and supersedes all prior agreements, discussions, negotiations and conversations regarding such subject matter. . . .

(ECF No. 192-6 §§ 13 & 14). Section 17 states that "[t]his Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Virginia in effect as of the date hereof, without reference to the choice of law principles thereof." (*Id.* § 17).

In the summer of 2009, Maxtena began work on a marine-based phased array antenna system for a client located in Germantown, Maryland. (ECF No. 199 ¶ 16). Marks, who at the time served as the Chief Technology Officer of the company, acted as the lead engineer for this time-sensitive project. Maxtena alleges that Marks became increasingly absent and unresponsive during late 2009 and into early 2010 because he was instead devoting his time and energy to other commercial opportunities. (*Id.* ¶¶ 27-28). Marks allegedly shared highly confidential and proprietary information belonging to Maxtena with a third party, including certain schematic drawings associated with the marine-based

antenna system.  Marks also purportedly incorporated an entity known as "Elevation Semiconductor" in January 2010, which he intended to function as a direct competitor to Maxtena.  (*Id.* ¶ 31).

On January 29, 2010, Maxtena held a board of directors meeting to discuss the possibility of reorganizing from a Virginia corporation to a Delaware corporation.  (*Id.* ¶ 32). Marks attended the meeting but allegedly did not disclose either the incorporation of Elevation Semiconductor or his sharing of confidential information with a third party.  Near the end of the January 29 meeting, Marks made a motion to reincorporate Maxtena in Delaware. (*Id.* ¶¶ 32-33).

Throughout the spring of 2010, Marks and his associates allegedly began to develop business for Elevation Semiconductor. Maxtena, meanwhile, continued work on the marine-based antenna project for its Germantown-based client and also prepared to reorganize under Delaware law.  On May 5, 2010, the Virginia corporation known as Maxtena ("Maxtena-Virginia") merged with its parent corporation, the Delaware corporation known as Maxtena ("Maxtena-Delaware").  (*Id.* ¶ 39*)*.  Marks approved the merger is his capacity as both a director of Maxtena-Virginia and Maxtena-Delaware.  The document titled "Agreement and Plan of Reorganization" (the "Merger Plan") provides, in relevant part, as follows:

1. **MERGER.**

1.1 **Merger.** In accordance with the provisions of this Agreement, the Virginia Stock Corporation Act ("the *Virginia Act*") and the Delaware General Corporation law ("the *DGCL*"), Maxtena-VA will be merged with and into Maxtena-DE (the "*Merger*"), the separate existence of Maxtena-VA will cease and Maxtena-DE will be, and is sometimes referred to in this Agreement as, the "*Surviving Entity*," and the name of the Surviving Entity will remain unchanged.

• . .

1.3 **Effect of the Merger**. Upon the Effective Date of the Merger, the separate existence of Maxtena-VA will cease and Maxtena-DE, as the Surviving Entity, (i) will continue to possess all of its assets, rights, powers and property as constituted immediately prior to the Effective Date of the Merger, (ii) will be subject to all actions previously taken by it and by Maxtena-VA, (iii) will succeed, without other transfer, to all of the assets, rights, powers and property of Maxtena-VA in the manner more fully set forth in Section 259 of the DGCL and Section 13.1-721 of the Virginia Act, (iv) will continue to be subject to all of the debts, liabilities and obligations of Maxtena-DE as constituted immediately prior to the Effective Date of the Merger, and (v) will succeed, without other transfer, to all of the debts, liabilities and obligations of Maxtena-VA in the same manner as if Maxtena-DE had itself incurred them, all as more fully provided under the applicable provisions of the DGCL and the Virginia Act.

2. **CHARTER DOCUMENTS, DIRECTORS AND OFFICERS.**

2.1 **Certificate of Incorporation**. The Certificate of Incorporation of Maxtena-DE

> as in effect immediately prior to the
> Effective Date of the Merger will continue
> in full force and effect as the Certificate
> of Incorporation of the Surviving Entity
> until duly amended in accordance with the
> provisions thereof and applicable law.
>
> 2.2 **Bylaws**. The Bylaws of Maxtena-DE as in
> effect immediately prior to the Effective
> Date of the Merger will continue in full
> force and effect as the Bylaws of the
> Surviving Entity until duly amended in
> accordance with the provisions thereof and
> applicable law.

(ECF No. 192-2, at 2-3).

Maxtena alleges that it discovered Marks's "disloyalty" and work on behalf of Elevation Semiconductor on July 7, 2010, at which time Marks admitted to sharing proprietary data belonging to Maxtena with third parties involved in Elevation Semiconductor. (ECF No. 199 ¶ 40). Marks purportedly explained his actions by stating that he needed a "backup plan" if things did not work out at Maxtena. (*Id.*). On July 26, 2010, Maxtena sent Marks a letter notifying him that he was being terminated and stating that Maxtena was repurchasing his shares in the company for $100, pursuant to the $100-Buyback Provision in the Shareholders Agreement. Marks refused to accept the letter. (*Id.* ¶¶ 50-51).

Based on these facts, the second amended complaint asserts six counts against Marks. Count I seeks a declaratory judgment that Maxtena is the rightful owner of Marks's shares in the

corporation by virtue of the $100-Buyback Provision (1) because Marks was terminated for "cause" and (2) because the Shareholders Agreement survived the merger of Maxtena-Virginia into Maxtena-Delaware "by design." (ECF No. 199 ¶¶ 54-59).

Count II asserts an alternative theory of relief with respect to Marks's shares in the event that the Shareholders Agreement did not survive the merger. (*Id.* ¶¶ 60-68). Specifically, Count II seeks a declaration that the 875,000 shares of Maxtena-Delaware issued to Marks should be rescinded or cancelled because, at the time of the merger in May 2010, Marks had already committed gross breaches of the fiduciary and legal duties he owed to Maxtena-Virginia. Count II alleges that if the Maxtena entities had been aware of Marks's misconduct in May 2010, Maxtena-Virginia would have exercised the $100-Buyback Provision in the Shareholders Agreement prior to converting Marks's shares in Maxtena-Virginia to Maxtena-Delaware stock. In the alternative to rescission or cancellation of Marks's shares in Maxtena-Delaware, Count II requests the court to "fashion another remedy such as a constructive trust sufficient to make Maxtena whole." (*Id.* ¶ 68).

The remaining counts in the second amended complaint assert claims against Marks for breach of fiduciary duty (Count III); violation of the Virginia Trade Secret Act (Count IV); violation of the Virginia Business Conspiracy Statute (Count V); and

breach of a proprietary information agreement Marks entered into with Maxtena (Count VI).

## B.  Marks's Affirmative Defenses & Counterclaim

In his answer to the second amended complaint, Marks asserts twenty-five affirmative defenses.  (ECF No. 191). Marks also asserts a five-count counterclaim.  In Count I, Marks seeks a declaratory judgment that he is the sole, rightful owner of 835,700 shares of Maxtena stock.  (*Id.* ¶¶ 53-63). Marks supports this count with a number of alternative arguments.  First, Marks alleges that the Shareholders Agreement applied only to Marks's shares in Maxtena-Virginia and did not survive the May 2010 merger – meaning that the contract has no applicability to Marks's termination, which occurred in July 2010.  Marks alternatively argues that he was not validly terminated for "cause" and that his termination was not effected in compliance with either the Maxtena-Virginia Shareholders' Agreement or the Maxtena-Delaware Bylaws.  Finally, Marks argues that enforcing the clause from the Shareholders Agreement would amount to an unconscionable contractual penalty, as it would require Marks to forfeit shares worth "nearly $6,000,000" in exchange for $100.00.

In Count II, Marks seeks a declaratory judgment that his work with Elevation Semiconductor was not in breach of the proprietary information agreement he signed with Maxtena and

that Maxtena does not own the work he produced during his time with Elevation Semiconductor. (*Id.* ¶¶ 64-73). In Count III, Marks seeks a declaratory judgment that either (1) establishes "the fair value that Marks is entitled to receive as consideration for the sale of his shares to Maxtena" or (2) orders that the fair value of his shares be determined by means of an appraisal. (*Id.* ¶¶ 74-80). To support this count, Marks alleges that, if the Shareholders Agreement is still applicable and if Marks was indeed validly terminated, he is entitled to receive fair value in exchange for his shares, which Maxtena has not offered. In Count IV, Marks alleges a breach by Maxtena of the Shareholders Agreement by allegedly failing to pay him any distributions while, at the same time, paying distributions to or for the benefit of other shareholders. In Count V, Marks alleges another breach of contract count, arguing that Maxtena was obligated to pay him an annual salary until he was validly terminated from his positions with the company.

### C. Maxtena's Amended Answer to Marks's Counterclaim

The scheduling order in this case set May 16, 2013 as the deadline for motions to amend the pleadings. (ECF No. 165). Maxtena moved to file a second amended complaint on the deadline, (ECF No. 168), which was ultimately granted by the court. (ECF No. 188). Consequently, Marks filed an answer to the second amended complaint along with his counterclaims on

July 3, 2013. (ECF No. 191). This most recent version of his counterclaims was identical to his original version filed in this court on January 25, 2012. (*See* ECF No. 34). On July 29, 2013, Maxtena filed its answer to these counterclaims. In addition to some cosmetic and typographical changes, Maxtena added six affirmative defenses:

> N.   Maxtena is entitled to a constructive trust or other similar relief with respect to any share interests Marks may have in Maxtena.
>
> O.   Maxtena is entitled to the relief it seeks in its Second Amended Complaint.
>
> P.   Some or all of Marks' claims are barred by the doctrine of unjust enrichment.
>
> Q.   Marks' claims to shares in Maxtena are barred because the terms of the Shareholders Agreement should be impressed upon him.
>
> R.   Some or all of the damages sought by Marks are subject to recoupment and/or set off.
>
> S.   Some or all of Marks' claims are barred because he breached the duty of good faith and fair dealing set forth inherent in the Shareholders Agreement.

(ECF No. 206, at 12). Maxtena failed to title this filing "Amended Answer."

## II.  Motion for Partial Judgment on the Pleadings

### A.   Standard of Review

Marks seeks judgment on Count I of the second amended complaint pursuant to Federal Rule of Civil Procedure 12(c),

which provides that "[a]fter the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings." Under the circumstances presented here, the standard applicable to a motion for judgment on the pleadings is the same as that applied when analyzing a motion to dismiss for failure to state a claim. *See Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the

light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B.   Analysis**

Marks contends that he is entitled to judgment on Count I of the second amended complaint as a matter of both contract interpretation and corporate law. (ECF No. 192-1, at 5). As a contractual matter, Marks contends that the Shareholders

Agreement (and the $100-Buyback Provision contained therein) applied only to "Shares" issued by the "Corporation," defined as Maxtena-Virginia. (*Id.* at 8-12). Because Maxtena is seeking to repurchase the shares that Marks holds in Maxtena-Delaware, Marks posits that the Shareholders Agreement is inapplicable by its own terms, regardless of whether Virginia or Delaware law applies. As a matter of Delaware corporate law, Marks argues that a shareholders agreement governing a corporate entity does not typically survive that entity's merger into a new entity *via* a stock-for-stock merger because, at that point, the entity and its shares (*i.e.*, the subject matter of a shareholders agreement) cease to exist. (*Id.* at 12-22). Marks notes that the parties to a merger may specifically agree for a disappearing entity's governing document to apply to a surviving entity, but contends that there was no such agreement here because the Merger Plan made no reference to the Shareholders Agreement. Marks also points out that some of the provisions in the Shareholders Agreement are directly contrary to the provisions in the Bylaws governing Maxtena-Delaware, a document that is specifically mentioned in the Plan of Merger. Accordingly, Marks asks for a declaration that Maxtena "lacks the purported contractual right or entitlement that Count I seeks to enforce" and that Maxtena's attempt to exercise the

$100-Buyback Provision "was erroneous, invalid, and ineffective." (*Id.* at 28).

As an initial matter, Maxtena argues that Marks's motion for judgment on the pleadings is procedurally flawed because the standard for dismissing a declaratory judgment claim is not whether the plaintiff is entitled to a declaration in its favor but whether there is an actual, live controversy between the parties. (ECF No. 207, at 12-14). Maxtena is correct that a Rule 12(b)(6) motion to dismiss for failure to state a claim is generally not the appropriate means of resolving a declaratory judgment claim where, as here, an actual controversy between the parties exists. *See Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. DKC 09-0100, 2011 WL 856374, at *18 (D.Md. Mar. 9, 2011); 22A Am.Jur.2d Declaratory Judgments § 232 (2013 supp.) ("A motion to dismiss is seldom an appropriate pleading in actions for declaratory judgments, and such motions will not be allowed simply because the plaintiff may not be able to prevail."). Therefore, Marks's motion for partial judgment on the pleadings will be construed as a motion for a declaratory judgment that the Shareholders Agreement did not survive the merger and, therefore, Maxtena's attempt to enforce the $100-Buyback provision was invalid.

Turning to the substance of Marks's arguments, Maxtena makes several responses. (ECF No. 207). First, Maxtena

contends that the plain language of the Shareholders Agreement evinces an intent for the document to remain operative as to shares issued by a successor entity, particularly where "the event that resulted in the change of form was nothing more" than a name change. (*Id.* at 18-23). Second, Maxtena distinguishes the Delaware authority relied on by Marks as involving the loss of rights of shareholders, which are derived solely from contracts, rather than the loss of rights of a corporation, which – pursuant to statute – can only be extinguished expressly. According to Maxtena, Maxtena-Virginia had a cause of suit against Marks at the time of the merger that was passed on to Maxtena-Delaware because the Plan of Merger did not expressly negate it. Finally, Maxtena argues that the "Look Back" provision in Section 13 of the Shareholders Agreement provides a separate basis for relief against Marks. (*Id.* at 23-24).

A helpful starting point is the Delaware case law cited by both parties. The general rule is that a corporate entity, along with its shares, ceases to exist upon its merger into a different corporate entity. As explained by the Delaware Court of Chancery in *Shields v. Shields:*

> At the moment a stock for stock merger is
> effective, the stock in a constituent
> corporation (other than the surviving
> corporation) ceases to exist legally. The
> subject matter of the stockholders'

> agreement thus vanishes, so to speak, at
> that point and its place is taken by a stock
> interest in another, distinct corporation.
> The merger accomplishes that result and
> necessarily legally moots the terms
> [embodied in an agreement governing the
> shares of] a disappearing corporation.

498 A.2d 161, 168 (Del.Ch. 1985); *see also Facchina v. Malley*, No. Civ.A. 783-N, 2006 WL 2328228, at *2 (Del.Ch. Aug. 1, 2006) (when a California corporation merged into a Delaware limited liability company, the California corporation "ceased to exist," meaning that "there was no longer any [corporate] stock; there were no [corporate] shareholders; and the [corporate shareholders] agreement lapsed").

Nonetheless, both *Shields* and *Facchina* recognize that the presumptive rule – *i.e.*, that a shareholders agreement is mooted upon the corporation's merger into another entity – can be overcome. First, the *Facchina* court observed that the parties to a merger could specifically agree that the surviving entity would be governed by the disappearing entity's shareholders agreement, so long as the agreement is express. In *Facchina*, the parties stated in their "Agreement and Plan of Merger" that "the Certificate of Formation and Limited Liability Company Agreement of [the LLC that was to serve as the Surviving Entity] as in effect immediately prior to the Effective Date shall be the Certificate of Formation and Limited Liability Company Agreement of the Surviving Entity." *Id.* Although the surviving

entity did not actually have a governing agreement in place at the time of the merger, and although the parties testified that they *intended* the shareholders agreement of the disappearing entity to carry forward, the court held that – absent an express agreement – the disappearing entity's shareholders agreement was no longer applicable. *Id.* at *2 & n.16.

Here, the Merger Plan did not mention the Shareholders Agreement at all but instead specified that the Bylaws of Maxtena-Delaware would govern the surviving entity. (ECF No. 191-4 § 2.2). This omission is not necessarily dispositive, however, as the *Shields* court separately recognized that the terms of a shareholders agreement itself could establish that it would continue to apply to shares issued by a new or surviving entity post-merger. *See Shields*, 498 A.2d at 168 (noting that a shareholders agreement "could provide that in the event of a merger resulting in the signatories holding shares of another corporation that certain consequences would occur" including by making certain of its terms applicable to "new stock"); *see also Budman v. St. Bernard Software, Inc.*, No. D052088, 2008 WL 2941386, at **8-9 (Cal.Ct.App. July 31, 2008) (unpublished) (Delaware law) (shareholders agreement applied to shares in a new, surviving entity post-merger because the agreement specifically provided that "upon a merger, [the shareholder's]

'substituted' securities 'shall be immediately subject to this Agreement for all purposes.'").

Thus, the key question here is one of contract interpretation: whether the Shareholders Agreement applies not only to shares issued by Maxtena-Virginia but also to shares issued by a successor to Maxtena-Virginia – namely, Maxtena-Delaware. The parties dispute whether this issue is governed by Virginia law, pursuant to the contractual choice of law provision in the Shareholders Agreement, or by Delaware law, pursuant to the internal affairs doctrine. Ultimately, however, the parties appear to agree that both states recognize the relevant principles of contract interpretation, so there is no need to decide as between the two states' law.

Under both Virginia and Delaware law, contracts are to be construed in accordance with the parties' intent, which typically is best evidenced by the language of the contract itself. *See Pocahontas Mining LLC v. CNX Gas Co.*, 276 Va. 346, 352 (2008) ("A court's primary focus in considering disputed contractual language is to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in their agreement."); *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008). Where an agreement is unambiguous (*i.e.*, where it is susceptible to only one reasonable interpretation), both Virginia and Delaware law

require the contract to be enforced according to the plain meaning of its terms, without resort to extrinsic evidence. *See Amos v. Coffey*, 228 Va. 88, 92 (1984) ("[W]hen the parties set out the terms of their agreement in a clear and explicit writing then such writing is the sole memorial of the contract and . . . the sole evidence of the agreement.") (internal quotation marks omitted); *Lillis*, 953 A.2d at 253. Likewise, in determining whether ambiguity exists, both Virginia and Delaware law require that the contract be considered as a whole and in a way that gives effect to every provision. *See Pocohontas*, 276 Va. at 353; *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). It also is well-settled under both states' law that contractual language will not be rendered ambiguous merely because the parties disagree about the meaning of such language. *See Doswell Ltd. P'Ship v. Virginia Elec. & Power Co.*, 251 Va. 215, 222-23 (1996); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

When the Shareholders Agreement is construed as a whole, its terms unambiguously establish that the contract applies to the shares of Maxtena-Delaware. As noted, the Shareholders Agreement defines "Shares" as "shares issues by the Corporation" and "Corporation" as "Maxtena, Inc., a Virginia corporation." Yet numerous other provisions of the Shareholders Agreement compel the conclusion that the "Corporation" can also include a

successor entity to Maxtena-Virginia. First, the definition of "Shares" applies to all "Shares" that may be "[i]ssued by the Corporation in the future pursuant to *any* . . . merger, share exchange . . . reorganization or other transaction." (ECF No. 191-4, at 1) (emphasis added). Marks contends that, notwithstanding the use of the word "any," the definition of "Shares" contemplates only those mergers and reorganizations where Maxtena-Virginia, the "Corporation," is the surviving entity. Yet Section 14 of the Shareholders Agreement expressly states that "this Agreement shall be binding upon and inure to the benefit of the parties hereto [and] their successors," to include a successor to Maxtena-Virginia, one of the parties to the agreement. (*Id.* § 14). If "Corporation" cannot be construed as encompassing an entity that succeeds Maxtena-Virginia after a merger or reorganization, then Section 14 would be rendered mere surplusage. *See TravCo Ins. Co. v. Ward*, 284 Va. 547, 552 (2012) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly."); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

Providing further support for this conclusion is the provision of the Shareholders Agreement which specifies two types of terminating events: an acquisition of either (1) substantially all of the assets of the Corporation or (2) all the outstanding Shares (whether by merger, share exchange or otherwise), provided that – in either case – the result of the acquisition is that "the Shareholders receiving cash or cash equivalents or Shares listed on the NASDAQ National Market System, over-the-counter market or traded on a national exchange." (ECF No. 191-4 § 13). Here, neither of these two events occurred. Moreover, as Maxtena explains in its opposition brief, the publicly traded "Shares" referenced in Section 13 must necessarily be issued by a surviving entity that is *not* Maxtena-Virginia because the issuance can occur only after an "acquisition of . . . *all* of the outstanding Shares." Maxtena-Virginia alone could never achieve such a feat: the only way to acquire *all* of its outstanding Shares in an exchange or merger whereby Shareholders received publicly traded Shares – with a capital "S" - would be for Maxtena-Virginia to issue the publicly traded Shares prior to the transaction. Yet the issuance of new Shares for such a purpose would necessarily mean that there could be no acquisition of "*all* the outstanding Shares" of Maxtena-Virginia.

Thus, construed as a whole, the Shareholders Agreement unambiguously applies to the Shares issued by Maxtena-Delaware. Marks highlights what he perceives as the inconsistent ramifications of this conclusion. (ECF No. 192, at 8-12; ECF No. 221, at 2-7). First, Marks contends that construing "Corporation" to include anything beyond Maxtena-Virginia leads to the anomalous result whereby *any* surviving entity could be covered by the Shareholders Agreement, including those entities that are wholly unrelated to Maxtena-Virginia. For example, Marks hypothesizes that – under Maxtena's proposed interpretation of the Shareholders Agreement – an unrelated company like Thuraya, Inc., could be a successor entity following an acquisition of or merger with Maxtena-Virginia. Second, Marks also contends that many provisions in the Shareholders Agreement are inconsistent with the provisions in the Maxtena-Delaware Bylaws, including the latter's provisions relating to the transfer of "the shares of common stock." (*See* ECF No. 192-5 § 46). Most notably, Marks points out that, unlike the Shareholders Agreement, the Maxtena-Delaware Bylaws do not contain any sort of repurchase right triggered by the death, disability, or termination of employment of a shareholder. (*See id.*).

Marks's arguments are unavailing. The relevant question here is whether the Shareholders Agreement applies to Maxtena-

Delaware, the surviving entity of a stock-for-stock merger with Maxtena-Virginia, the purpose of which was to "constitute a tax-free transfer reorganization under Section 368(a)(1)(F) of the Internal Revenue Code." (ECF No. 192-2, at 1). There is no need to speculate if or how the Shareholders Agreement might apply to some other successor entity. Likewise, the silence of the Maxtena-Delaware Bylaws on the issue of repurchase rights does not create an irreconcilable conflict with Sections 5 and 6 of the Shareholders Agreement. To the extent there may be actual and direct conflicts between other provisions of the Shareholders Agreement and the Bylaws, that issue is not before the court at this time.

In sum, the plain language of the Shareholders Agreement makes clear that it applies to the "Shares" issued by Maxtena-Delaware, a successor entity to Maxtena-Virginia. Accordingly, Marks motion for a declaratory judgment that the Shareholders Agreement did not survive the merger will be denied.[2]

## III. Motion to Strike Answer and Other Defenses of Maxtena, Inc. to Counterclaim

It is undisputed that the deadline for moving for amendment under the scheduling order was May 16, 2013. Marks argues that

---

[2] In light of this conclusion that the Shareholders Agreement applies to Maxtena-Delaware by its plain terms, Maxtena's alternative arguments regarding the "Look Back" clause and the possibility that Maxtena-Virginia provision had "cause of suit" at the time of the merger need not be reached.

Maxtena's addition of defenses to its answer to Marks's counterclaim constitutes an amendment to Maxtena's pleadings. Rule 16(b)(4) provides that a "schedule may be modified only for good cause and with the judge's consent." A party who fails to obey a scheduling order may incur sanctions, Fed.R.Civ.Pro 16(f), to include striking pleadings in whole or in part. *Id.* Rule 37(b)(2)(A)(iii). The practical effect of this point is that Plaintiff's motion triggers both Rule 15(a), governing amendments to pleadings, and Rule 16(b), governing modification of the schedule.[3]

The standards for satisfying these two rules are at odds. Rule 15(a)(2) provides, in pertinent part, that "leave [to amend] shall be freely given when justice so requires," while Rule 16(b)(4) states that "[a] schedule may be modified only for good cause and with the judge's consent." The United States Court of Appeals for the Fourth Circuit resolved this tension in *Nourison Rug Corp. v. Parvizian*: "Given their heavy case loads, district courts require the effective case management tools provided by Rule 16. Therefore, after the deadlines provided by

---

[3] An answer to a counterclaim is considered a pleading. Fed.R.Civ.Pro. 7(a)(3); *see also U.S. Home Corp. v. Settlers Crossing, LLC*, No. DKC 08-1863, 2012 WL 3536691, at *7 (Aug. 14, 2012) ("Rule 16(b)'s good cause requirement applies with equal force to the proposed amendment of Plaintiffs'/Counter Defendants' answer to the joint counterclaim as it does with the proposed amendment of U.S. Home's complaint.").

a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings." 535 F.3d 295, 298 (4th Cir. 2008). If a party fails to show good cause, the court's inquiry ends, and it need not consider whether the moving party meets the requirements of Rule 15(a). *United States v. Godwin*, 247 F.R.D. 503, 506 (E.D.N.C. 2007).

Rule 16(b)'s "good cause" standard focuses on the timeliness of the amendment and the reasons for the tardy filing. Because a court's scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril," *Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678, 707 (D.Md. 2011) (quotation marks and internal citations omitted), a movant must demonstrate that the reasons for the tardiness of its motion justify a departure from the rules set by the court in its scheduling order. Thus, the primary consideration of the court in addressing whether "good cause" has been shown under Rule 16(b) relates to the movant's diligence. *Montgomery v. Anne Arundel Cnty., Maryland*, 182 F.App'x 156, 162 (4th Cir. 2006) (per curiam). Lack of diligence and carelessness are the "hallmarks of failure to meet the good cause standard." *West Virginia Housing Dev. Fund v. Ocwen Technology Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va. 2001). "[T]he focus of the inquiry is upon the moving party's reasons for seeking

modification.  If that party was not diligent, the inquiry should end."  *Marcum v. Zimmer,* 163 F.R.D. 250, 254 (S.D.W.Va.1995).

Maxtena argues that it its most recently filed answer does not constitute an amended filing, but instead is merely the fulfillment of its obligations under the rules to present any and all available defenses when presented with a pleading. According to Maxtena, once Marks refiled his counterclaim, Maxtena was forced to serve a response pursuant to Rules 12(a)(1)(B) and (a)(4).  (ECF No. 243, at 2-3).  Pursuant to that requirement, Maxtena was duty-bound by Rules 8 and 11 to "determine if the Answer, as it stood, could be refiled or whether changes were either necessary or mandatory."  (*Id.* at 3).[4]

---

[4] Rule 8(c)(1) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  Rule 11(b) provides that:

> [b]y presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . (2) the claims, defenses, and other legal contentions are warranted by existing law. . .; (3) the factual contentions have evidentiary support . . . after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are

Marks contends that he included his counterclaims with his answer to Maxtena's second amended complaint to ensure they would be not be deemed waived or abandoned. (ECF No. 225, at 6). Additionally, Marks represents that he was careful to include counterclaims identical to those previously filed so that they would not be considered an amended pleading subject to the Scheduling Order and Rule 16. (ECF No. 256 ¶¶ 7, 11). Marks submits that he was forced to do this because the case law is not definitive on the question of whether a party must reassert its counterclaims amongst its answer to an amended complaint, so he did so out of an abundance of caution. (*Id.* at 10 n.5). Marks cites *Ground Zero*, where this court acknowledged that "the few courts to consider the issue have not reached a consensus," before ultimately adopting the view that a counterclaim is independent of an answer and does not need to be set forth in an amendment to an answer. 813 F.Supp.2d at 705-06.

*Ground Zero*'s legal conclusion remains sound, and it guides the outcome, though not in a manner presented by either party. A refiled counterclaim, even where verbatim to the original filing, becomes the newly operative pleading. *See Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) ("As a general rule, an amended pleading ordinarily supersedes the original and

reasonably based on belief or a lack of information.

renders it of no legal effect.") (quotation marks and internal citations omitted).[5]  Once Marks's counterclaim was refiled, it became the operative pleading.  But such a filing violated the Scheduling Order's May 16th deadline for motions to amend the pleadings.  The filing of the new counterclaim was not accompanied by a motion to amend its previous filing and even construing it as such, the court would deny it because it runs counter to the clear holding of this court in *Ground Zero* that such counterclaims are independent of an answer and the filing of the latter does not require the filing of the former.

Consequently, the refiled counterclaim, (ECF No. 191, at 12-28), shall be stricken.  The original counterclaim, filed with this court on January 25, 2012, remains the operative pleading.  (ECF No. 34, at 11-27).  This renders Maxtena's effort to amend its answer in response to Defendant's July 3, 2013 counterclaim as moot.

This outcome does not foreclose the possibility of Maxtena being allowed to amend its original answer to include the six new defenses, but as it comes after the May 16th deadline, they must satisfy: (1) Rule 16 to modify the scheduling order; and (2) Rule 15 to amend pleadings.  To the extent their brief engages the Rule 16 "good cause" requirement, Maxtena's two

---

[5] The court construes the refiled counterclaim as an amended pleading, even if it is identical to its previous iteration.

30

arguments are not persuasive. First, Maxtena argues that "Marks elected to refile a pleading that required Maxtena to respond," which, pursuant to Rules 8, 11, and 12 contemplates changes to the subsequent answer. (ECF No. 243, at 10). But as discussed above, Marks should never have filed a new counterclaim and it is no longer operative, thereby obviating any need by Maxtena to reassess its defenses. Second, and relatedly, Maxtena argues that it did not seek to amend, but instead it was Marks's actions in refiling the counterclaim that "reopened the door to amendment." (*Id.*). This argument will be rejected for the same reasons as Maxtena's first argument. Furthermore, Maxtena does not explain why it did not seek to amend its answer at the same time it sought to amend its complaint because, as it admits, four of the six defenses stem from its amended complaint. (*Id.* at 11). Therefore, to the extent Maxtena moves to amends its answer to Marks's January 25, 2013 counterclaim, that motion will be denied.

## III. Conclusion

For the foregoing reasons, the motion for partial judgment on the pleadings filed by Defendant will be denied. The motion to strike Plaintiff's amended answer will be granted. A separate Order consistent will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge